**Dannett MADISON, on behalf of herself and others similarly situated, Plaintiff,**

v.

**RESOURCES FOR HUMAN DEVELOPMENT, INC., Defendant.**

No. Civ.A. 97–7402.

United States District Court, E.D. Pennsylvania.

Jan. 8, 1999.

**544**

Joshua P. Rubinsky, Philadelphia, PA, Jay H. Dahlke, Brodie & Rubinsky, Philadelphia, PA, for Dannett Madison, on behalf of herself and others similarly situated, plaintiff.

Paul G. Nofer, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Resources for Human Development, Inc., defendant.

### MEMORANDUM AND ORDER

KATZ, District Judge.

The plaintiffs, an opt-in class of fourteen current and former employees of defendant Resources for Human Development, Inc. (RHD), claim that RHD underpays its employees for overtime because it does not include bonuses and its contributions to the employees' benefit plan in the employees' regular pay rate as required by the Fair Labor Standards Act (the FLSA). Before the court is the defendant's motion for summary judgment.[1]

---

1. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *See id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 639 (3d Cir.1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989).

The Fair Labor Standards Act is intended to guarantee to employees certain minimum labor standards. *See Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). It does so principally by requiring the payment of a minimum wage and the payment of an overtime premium of one and one half times the employee's regular rate of pay for hours worked in excess of forty in a given week. *See* 29 U.S.C. §§ 206, 207(a). At issue in this case is whether the defendant is properly calculating its employees' regular rate. It uses their hourly wage, but plaintiffs argue it should be higher because it should include contributions to the benefit plan and bonuses. Preliminary to those issues, though, RHD argues that the FLSA's overtime pay rule is not applicable to plaintiffs at all because they are a type of employee exempted from the Act's coverage.

*Companion Exemption*

RHD argues that the plaintiffs are not covered by the FLSA because they are members of a class of employees exempted by statute. Specifically, the Act excludes from coverage "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). To fit within the exemption, then, the statute requires that three elements must be met: (1) the employees must be employed in domestic employment, (2) the employees must provide companionship services, and (3) the services must be for qualified aged or infirm individuals.

Exemptions from the FLSA are to be construed narrowly against the employer. It is the employer's burden to prove that its employees come within the scope of the exemption, and "any exemption from the Act must be proven plainly and unmistakenly." *Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 412 (3d Cir.1992). The specific requirements of the elements of the companion exemption are not set forth in the statute. Rather, they are articulated in the regulations and interpretations of the Secretary of Labor.[2] The regulations define "domestic service employment" as follows:

> services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed.[3] The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs.... This listing is illustrative and not exhaustive.

29 C.F.R. § 552.3. To restate, to be employed in domestic employment, employees must perform household services in a private home.

Defendant cannot satisfy its burden of proving that its employees meet this test for domestic employment, because RHD's clients' homes are sufficiently institutionalized that they are not "private homes" within the meaning of the statute. The court's decision is informed by the similar analyses performed by other district courts in *Linn v. Developmental Servs. of Tulsa, Inc.*, 891 F.Supp. 574, 577–80 (N.D.Okla.1995), and *Lott v. Rigby*, 746 F.Supp. 1084, 1086–89 (N.D.Ga.1990), as

---

**2.** The regulations are promulgated pursuant to an express delegation of legislative authority and must be given controlling weight unless they are found to be arbitrary, capricious, or contrary to the statute. *See Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**3.** Although the plaintiffs are employed by RHD rather than the individuals they serve, that by itself does not exclude them from the exemption. *See 29 C.F.R. § 552.109* (providing that employees who provide companionship but who are employed by an employer or agency other than the family or household using the services can qualify for the companion exemption).

well as *Terwilliger v. Home of Hope, Inc.,* 21 F.Supp.2d 1294, 1300 (N.D.Okla.1998). *See also Bowler v. Deseret Village Assoc., Inc.,* 922 P.2d 8 (Utah 1996). Each of these cases makes it clear that the private home determination is highly fact-specific and to be made on a case-by-case basis, and that no one factor is dispositive. To engage in the required analysis of the facts, it is first necessary to set forth a somewhat detailed description of the RHD program.[4]

RHD is a non-profit corporation engaged in providing human services programs including head-start programs, community health centers, low income housing, transportation services, community living programs for adults with mental health and mental retardation challenges, drug and alcohol abuse programs, and assistance to homeless people. To do so, it is subdivided into several programs, and it employs a total of approximately 2,400 people. Plaintiffs are or were residential advisors in RHD's "Mandela" and "Visions" programs. These programs provide assistance, support, and training to adults who face mental health or mental retardation challenges. Stip. ¶¶ 1–4.

These RHD programs serve adults released from state mental hospitals or referred by other agencies who are not able to care for themselves on their own but do not need hospitalization. *See* Def.Ex. 1 (Bligen.Decl.) ¶ 2; Def.Ex. 3 (Johnson Decl.) ¶ 2. The case managers overseeing the individuals' de-institutionalization must find a service provider that will provide community living arrangements in a controlled setting. RHD, through its Mandela and Visions programs, is one such provider in the Philadelphia area. The RHD community living arrangements are considered a middle step to independence. Some of the clients can learn to live on their own, through a long and difficult process.

Each individual receives the services of a county case management team, which oversees the use of government funds based on a treatment plan developed by the county mental health professionals on the team, with the input of the individual, the individual's advocate, and family members. When a service provider such as RHD is involved, it also has input into the development of the treatment plan. The plan, the contents and implementation of which are controlled by state and federal regulations, specifies the individual's appropriate living arrangement. If RHD and the individual agree to place the person in the program after a referral from the case manager, state and federal resources that supported that person in the institution or prior living arrangement follow him or her into the RHD community living arrangement. See Pl.Ex. 2 (Bligen Dep.) at 5–7. Once RHD enters into a contract with the county undertaking to provide services for the individual, it must comply with the requirements of the plan to receive funding. County case managers and other county officials assess compliance through periodic review of documentation and quarterly and yearly inspections. *See* Pl.Ex. 4 (Cox–Scales Dep.) at 35.

When a client first is referred to an RHD program, one of the first tasks for the client and RHD is to decide where the client will live. Usually, the RHD representative will know at the time of the

---

4. The record supplies all the facts necessary to the determination of whether an exemption to the FLSA applies, so in ruling on summary judgment the court is not making any findings regarding the historical facts or making any factual inferences. *See Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 900 (3d Cir.1991), *citing Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 713, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) and *Walling v. General Indus. Co.,* 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088 (1947). Although the parties stipulated to few facts, the parties' factual presentations contain no material factual disputes. The parties do, of course, disagree as to what legal conclusions should be drawn from the facts, and the resolution of that disagreement is the task the court undertakes in ruling on summary judgment.

initial interview at which location the new client will be placed. In other instances, the RHD representative will work with a realtor to develop a list of locations that are pre-approved by the county case management team. Only after that pre-approval is the location shown to the client. *See* Pl.Ex. 2 (Bligen Dep.) at 20, 34–35. The client enters into a rental agreement with RHD, and RHD rents from whatever third party owns the property (RHD owns one location itself). *See* Pl.Ex. 15–18 (examples). Each lease RHD enters into with a landlord contains a clause which provides that if the program loses government funding, RHD may terminate the lease. *See* Pl.Ex. 5 (Jackson Dep.) at 147; Pl.Ex. 17 (example).

RHD clients pay up to seventy-two percent of their monthly Social Security Disability payments to RHD, which goes toward rent and other ordinary household expenses such as food and utilities. *See* Def.Ex. 1 (Bligen Decl.) ¶ 6; Def.Ex. 3 (Johnson Decl.) ¶ 6. In the case of at least one residence, the amount paid by the client does not cover the lease expenses of the home.[5] For an apartment at the 1705 Hamilton Building for which RHD pays monthly rent of $649, the one client who lives there pays $375.41 monthly, which goes not only to rent but for food and utilities. The difference is made up by state and county funds. *See* Pl.Ex. 2 (Bligen Dep.) at 39. Utilities are frequently registered in the resident's name, *see* Def Ex. 1 (Bligen Decl.) ¶ 8; Def.Ex. 3 (Johnson Decl.) ¶ 8, but under the terms of the lease the utility charges are included as part of the client' room and board payment to RHD. *See* Def.Ex. 1B.

All residents of RHD housing are bound by the house rules, which include the following: no drugs or alcohol, no loud music, residents must be dressed if outside their bedrooms between 8:30 a.m. and 10:00 p.m., and residents are to "keep the staff of Mandela apartments informed as to their whereabouts at all times." These rules are in the rental agreement the client signs with RHD. *See* Def.Ex. 1B.

RHD employees handle the personal spending money of some clients. Fifteen dollars per week (Social Security Disability provides thirty dollars each month, which amount is supplemented by the county) is disbursed by the county case manager to an RHD staff member, and the RHD staff then disburses the money to the client as provided in the individual's treatment plan. For clients who can handle fifteen dollars at a time, the whole amount is given to them once a week; for individuals who cannot manage such a sum of money all at once, it is disbursed in three dollar increments over the course of the week. *See* Pl.Ex. 2 (Bligen Dep.) at 22–25. RHD maintains a custodial account for receipt of the clients' Social Security benefits. Often, RHD is made the payee of the Social Security checks. *See* Pl.Ex. 5 (Jackson Dep.) at 40–41.

To the extent they are physically and mentally able, the residents are responsible for maintenance and upkeep of the homes, cooking their own meals, and washing themselves and their own clothes. *See* Def.Ex. 1 (Bligen Decl.) ¶ 8; Def.Ex. 3 (Johnson Decl.) ¶ 8; Def.Ex. 16 (Richards Dep.) at 64. The residents choose the food they purchase and meals they eat on a given day, as well as the clothes they purchase and the outfits they wear on any given day. *See* Def.Ex. 1 (Bligen Decl.) ¶ 9; Def.Ex. 3 (Johnson Decl.) ¶ 9.

A set of keys is kept at each location for use by the RHD staff while on duty. The RHD staff must knock before entering. Each client has keys to his or her house if able to do so. *See* Def.Ex. 3 (Johnson Decl.) at 7. Only six out of the eleven clients in the Mandela program have keys to the houses. Only three out of the eleven residents are allowed, by RHD policy,

---

5. There is partial evidence in the record regarding one other residence for which the same seems to be true. *Compare* Pl.Ex. 17; Pl.Ex. 18. There is no evidence regarding rent discrepancies at the other homes.

to leave the location unattended. *See* Pl. Ex. 2 (Bligen Dep.) at 28.

■ RHD emphasizes several factors in arguing that the clients live in private homes, noting especially that the clients themselves decide whether they have housemates and, if so, with whom they share, and that they select the furnishings of their homes. It is true that the court in *Terwilliger v. Home of Hope, Inc.,* 21 F.Supp.2d 1294 (N.D.Okla.1998), considered these factors important in ruling that community living arrangements similar to the ones in RHD's programs were private homes. The present case, however, can be distinguished from *Terwilliger* in at least one crucial regard: the *Terwilliger* court considered very persuasive the fact that all of the clients had a possessory interest in their homes by owning them outright or leasing them directly from independent third parties. *See id.* at 1299–1300. Here, by contrast, all of the clients rent from RHD. More important than a particular factual difference is that, as the *Terwilliger* court correctly stated, the determination of whether the homes are private is made by "[c]onstruing the factors as a whole." *Id.* at 1300.

The conclusion to be drawn from all the above facts is that RHD runs these homes as part of an overall care program, and the residents live there as clients of the program. While it is true that RHD gives its clients the opportunity to make many choices within its limits, the fact remains that RHD is in charge of the homes from the time of the client's entry into the program and continues to be in charge throughout the client's residency. RHD either places the client into one of its already existing locations, or it limits and supervises the client's choice of a location. RHD rents the apartments and houses, while the clients pay monthly room and board fees that, in at least one case, do not cover the rent. Some of the residents do not even have keys to the homes, and most of them are not allowed to come and go as they please. The maintenance of the homes and the residents' activities in them are regulated by state and county laws and RHD's rules. The clients did not live in the homes before they became RHD clients, and they would not live in them but for their association with RHD.

It is true that this physical setting is different from an easy-to-spot institution consisting of dormitory-style wards, a cafeteria, and communal lounge areas, and it is true that the residents' daily activities are different than if they lived in such an institution. The setting is equally different, however, from an easy-to-spot private home. For example, in both *Sandt v. Holden,* 698 F.Supp. 64 (M.D.Pa.1988), and *Salyer v. Ohio Bureau of Workers' Compensation,* 83 F.3d 784 (6th Cir.1996) (both cases examining other aspects of the companion exemption), the families lived in their homes prior to and independent of their receipt of companion services. On the continuum between what is clearly an institution and what is clearly a private home, there certainly is a gray area. In fact, as "a middle step to independence," that is exactly what the RHD homes are intended to be during the transition from institutionalization to independent living. However gray the area is, though, the residences must be categorized as one or the other for the purposes of the companion exemption to the FLSA, and when all the factors regarding these homes are analyzed, they simply do not qualify as private. Therefore, the RHD residential advisors working there do not qualify for the companion exemption, and plaintiffs are covered by the FLSA.[6]

---

**6.** Because of this ruling, the court need not reach the remaining element of the exemption—the difficult issue of whether plaintiffs provide companionship services. The regulations define "companionship services" as follows:

those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of aged or

### Inclusion of Cafeteria Plan Contributions in the Regular Rate

The FLSA provides that an employee who works more than forty hours per week must be compensated for the additional hours at a rate at least one and one-half times the employee's regular rate. *See* 29 U.S.C. § 207(a)(1). "Regular rate" is defined in relevant part as

all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include ... contributions irrevocably made by an employer to a trustee or a third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits for employees.

29 U.S.C. § 207(e)(4). The issue in this case—whether the contributions RHD makes to its benefits plan should be included in calculating the regular rate, thus requiring RHD to pay higher overtime wages than it does—turns on the apparently entirely novel legal question of whether RHD's benefit program is a bona fide plan within the meaning of the statute.

The Department of Labor regulations specify the conditions that a benefit plan must meet to qualify as a bona fide plan and thus qualify the employer's contributions for exclusion from the regular rate calculation. At issue here is the following requirement:

The plan must not give an employee ... the option to receive any part of the employer's contributions in cash instead of the benefits under the plan: Provided, however, [t]hat if a plan otherwise

qualifie[s] as a bona fide benefit plan under section 7(e)(4) of the Act, it will still be regarded as a bona fide plan even though it provides, as an incidental part thereof, for the payment to an employee in cash of all or a part of the amount standing to his credit (i) at the time of the severance of the employment relation due to causes other than retirement, disability, or death, or (ii) upon proper termination of the plan, or (iii) under circumstances specified in the plan and not inconsistent with the general purposes of the plan to provide the benefits described in section 7(e)(4) of the Act.

29 C.F.R. § 778.215(a)(5).[7]

### The Fairshare Plan's Operation

RHD's benefits program is called the Fairshare Plan. It is set up as a cafeteria plan that allows employees to select the benefits they would like to receive from a menu including health insurance, a medical reimbursement account for themselves and/or their dependents, life insurance, long term disability insurance, and cash. *See* Pl.Ex. 2 (Taylor Decl.) ¶ 3. RHD makes a monthly contribution to each employee's Fairshare account in the amount of seven percent of the employee's base salary plus one hundred dollars. Stip. ¶ 7. Employees are permitted to designate part of their wages to go into their account to purchase benefits beyond what can be purchased for the amount deposited by RHD. *See* Def.Ex. 2 (Taylor Decl.) ¶ 4. Employees can elect to receive any part or all of RHD's monthly contribution in cash rather

---

infirm persons such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work; Provided, however, that such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. 29 C.F.R. § 552.6. The parties vigorously dispute whether the quantity and nature of the household work plaintiffs do qualifies or disqualifies them as companions.

**7.** The other requirements are as follows: (1) the contributions must be made according to

a specific plan; (2) the primary purpose of the plan must be to provide systematically for the payment of benefits on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, and the like; (3) the amount of the benefits must be specified or determinable by a definite formula; and (4) the employer's contributions must be paid irrevocably to a trustee or other third person fund arrangement. *See* 29 C.F.R. § 778.215(a).

than use it to pay for benefits. *See* Def. Ex. 2A (Fairshare Plan) at 14 ("Each Participant may choose to receive all or part of his Fairshare Benefit Dollars as a cash option added to his paycheck...."). The plan's cash option is in direct contravention of the regulation, so the Fairshare Plan can only be a bona fide plan if it fits within one of the regulation's exceptions.

RHD argues that its plan's cash option falls within the exception of the language quoted above. To come within the exception, the cash option must be (1) an incidental part of the plan, (2) available under circumstances specified in the plan, and (3) not inconsistent with the purpose of the plan to provide benefits. The Fairshare Plan's cash option fails each part of that test.

*Incidental Part of the Plan*

█ The plan does not treat the cash option as incidental; rather, it is presented as an integral part of the plan, coequal with the other benefits offered. *See* Def. Ex. 2A (Fairshare Plan) at 14. It does not make sense to call the availability of cash payment "incidental" when an employee can elect to receive all cash. For an employee who so elects, certainly the cash option is not an incidental part of his or her benefits package, indeed, it is the entire package.

*Available Under Circumstances Specified by the Plan*

█ The Fairshare Plan plainly provides as follows: "Coverage Options. Each Participant may choose to receive all or part of his Fairshare Benefit Dollars as a cash option added to his paycheck...." Def.Mot.Ex. 2A (Fairshare Plan) at 14. That language simply does not specify any circumstances under which the cash option is available; the implication is that the plan allows employees to elect the cash option under any and all circumstances.

This does not comport with the plain requirement of the regulation.

RHD might be able to modify its plan to make it a bona fide plan exempted from inclusion in the regular rate by adding conditions to the availability of the cash option. Perhaps the plan could say cash is available for a limited period of time if an employee experiences a family emergency or change in family circumstances. Perhaps the plan could articulate a standard in accord with what RHD claims is the actual primary use of the cash option: when an RHD employee has no need for benefits because he or she is already fully covered by a spouse's plan.[8] If the plan listed any of these or other circumstances, this court would have to decide whether the circumstance qualified, a question which could be a nuanced and difficult one. The court does not offer any opinion on the validity of the hypothetical circumstances. The question would be whether a particular named circumstance would qualify under the statute. That question, however, is not presented here; presented instead is the much simpler question of whether a plan that lists no circumstances at all qualifies under exception (iii). Simply put, it does not.

*Not Inconsistent with the Purpose of the Plan*

█ RHD characterizes the purpose of its cafeteria plan as to provide "(1) a roughly equal level of benefits to all participants; and (2) the flexibility for each employee to choose the options from which they would most benefit." Def.Mot. at 27. Unfortunately for RHD's argument, the statute does not allow the employer the opportunity to name its plan's own purpose with which a cash payment option does not conflict; rather, the statute requires that the incidental cash payment be consistent with the "general purposes of the plan *to provide the benefits* described in section 7(e)(4) of the Act," which in turn prescribes the purpose of "providing old-age,

8. There is no evidence in the record to show how many employees use the all-cash option, or how many those employees are covered by other insurance.

retirement, life, accident, or health insurance or similar benefits for employees." 29 C.F.R. § 778.215(a)(5); 29 U.S.C. § 207(e)(4). If an employee uses the Fairshare program to supplement his or her monthly salary by seven percent plus one hundred dollars, thereby foregoing benefits, no part of the statutorily defined purpose is served; rather, it is thwarted. The plan's allowed circumstances of "any and all" are inconsistent with the prescribed purposes.

### The Tax Code's Cafeteria Plan Provision

■ Defendant argues that the existence in the Internal Revenue Code (the IRC) of a section creating cafeteria plans should change the court's FLSA analysis. At 26 U.S.C. § 125, the Internal Revenue Code provides that amounts received by an employee under a cafeteria plan are not included in the employee's gross income. That section defines a cafeteria plan as a written plan in which all participants are employees and "the participants may choose among 2 or more benefits consisting of cash and qualified benefits." 26 U.S.C. § 125(d)(1). RHD has structured its plan according to this tax provision, including offering the cash option the statute allows.

RHD argues that the tax code and the FLSA are inconsistent and that it cannot be Congress's intent that the FLSA punish an employer for complying with the tax code by making it pay more overtime. RHD argues that the FLSA regulations were written many years before the IRS created the cafeteria plan provision, so the FLSA regulations should be read in light of and consistent with the newer tax law, instead of being read so as to create a situation that puts employers between the proverbial rock and a hard place.

This argument is unavailing, because the two statutes are not actually inconsistent. There is nothing inconsistent in telling employers that if they structure their benefit program to include an unlimited cash option, the contributions are not included in their employees' gross income, and the contributions are included in the regular rate calculation of the FLSA. Moreover, if limiting circumstances for the cash option were included in the plan, it could still qualify as a cafeteria plan under the IRC and qualify as a bona fide plan under the FLSA. Thus, the existence of the cafeteria plan provision in the tax code does nothing to alleviate the Fairshare Plan's violation of the governing FLSA regulation.[9]

### Inclusion of Bonuses in the Regular Rate

The FLSA's definition of regular rate includes an exception for bonuses:

> Sums paid in recognition of services performed during a given period [are not included in the regular rate] if ... both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly. . . .

29 U.S.C. § 207(e)(3). RHD argues that its bonuses are given at the discretion of the company and are not promised in advance, and are therefore excludable from the regular rate computation. Plaintiff's argue that RHD's bonus policy is formulated so that RHD has no discretion as to the amount of bonuses given, thus making the bonuses includable in the regular rate calculation.

RHD's written bonus policy, distributed to employees as part of the written corporate personnel policy from 1991 to 1998 reads as follows:

**9.** Plaintiff makes several other arguments against the Fairshare Plan's bona fide status. Because of the decision here, it is not necessary to discuss the others, but the court notes that it does not rely on any of them in reaching the conclusion that Fairshare is not a bona fide plan.

Occasionally, if funds are available, bonuses may be granted. Bonuses are considered as [a] general reward to an entire program staff and must be applied consistently. That is, if bonuses are to be approved, they must be of equal dollar value to each employee and must meet all other stated guidelines for fairness. The dollar amount should be pro-rated for less than full-time or less than full-year service and must be limited to a maximum of $1,000.00 per employee. Bonus plans submitted for approval by a Unit Director may only *exclude* employees whose performance is sufficiently inadequate to warrant probation or is impending dismissal. Such exclusions must be documented and maintained in the employee's personnel file.

*See* Pl.Memo. at 38–39. The current version (presumably put in-effect after the start of this litigation) is similar:

Program bonuses ... may be considered when there is evidence of unexpended budgeted program funds. It is the policy of RHD that any program or group of programs which generate funds available to be used for bonuses must distribute such funds equally to all members of the group(s). To participate in bonuses, employees must be regularly scheduled staff, meeting the standards/expectation of the position, and actively employed by RHD at the time of bonus distribution. Bonus amounts are pro-rated for less than full time and/or full year employment and may have additional stipulations attached as determined by the program(s) involved.

All bonus plans must have the prior approval of the Hub budget and program managers. Such bonuses can be declared at any time in a year but are most likely to occur at the end of a fiscal/contract year. No benefit dollars are paid on bonuses. Bonuses will not be used to calculate rate of pay.

*See* Pl.Ex. 23 (policy in effect May 1, 1998) ¶ 2. RHD's Human Resources Director explains that the bonuses are given in a way that satisfies the statute: "RHD has absolute discretion to determine if bonuses are to be paid and, if so, how much those bonuses will be. RHD has never promised its employees a bonus or contractually agreed to pay bonuses." Def.Ex. 2 (Taylor Decl.) ¶ 7. Plaintiffs make three arguments denying that the bonuses satisfy the statute, but none succeeds.

■ Plaintiffs argue that this policy on its face created a reasonable expectation by the employees that they would and will receive annual bonuses, because it says that bonuses will be paid "to an entire program's staff." This argument is unavailing, as both policies explicitly state that bonuses will be given only if funds are available. In fact, the policy does not even require that bonuses be given even when funds are available; it remains at RHD's discretion. The fact that the policy requires that bonuses be given to all staff if given at all does not require, nor even suggest, that bonuses will in fact be given.

■ Plaintiffs next argue that the policy on its face abandons RHD's discretion as to the amount of the future bonuses. This argument is also unavailing: Although the earlier policy does set a maximum amount, and both policies include a pro-rating formula and a requirement that bonuses be given equally to all staff members, neither policy sets a certain amount for the possible bonuses. *Cf.* 29 C.F.R. § 778.211(b) (an employer who promises sales employees a bonus of "one cent for each item sold" has abandoned discretion with regard to the amount of the bonus).

■ Plaintiffs lastly contend that RHD's bonus policy is non-discretionary on its face because it creates a bonus system that fits the following description:

Attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work, bonuses contingent upon the employee's continuing in employment until the time the payment is to be made and the like are in [the]

category [of promised bonuses]. They must be included in the regular rate of pay.

29 C.F.R. § 778.211(c). Once again, this argument is unavailing, because what the regulation means is that a bonus promised conditionally is promised all the same. Here, the policy's requirements that an employee be employed at the time of bonus distribution and be performing satisfactorily are not conditions placed on an otherwise-promised bonus, because no bonus is promised.

## Conclusion

The plaintiffs are not employees exempted from FLSA coverage by the companion exemption, so RHD's overtime payment must comply with FLSA's rules. The employer's contributions to the Fairshare Plan must be included in calculating the regular rate, because the plan's cash option defeats its status as a bona fide plan. RHD's bonus payments are excludable from the regular rate calculation because they are properly discretionary. For these reasons, defendant's summary judgment motion will be granted as to the bonus issue and otherwise denied. An appropriate Order follows.

## ORDER

**AND NOW,** this 8th day of January, 1999, upon consideration of the Motion of Defendant for Summary Judgment, and the response thereto, it is hereby **ORDERED** that the motion is **GRANTED in part** and **DENIED in part** as described in the foregoing Memorandum.