

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-2000

# Madison v. Resources for Human Dev.

Precedential or Non-Precedential:

Docket 99-1821

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Madison v. Resources for Human Dev." (2000). *2000 Decisions.* Paper 257.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/257

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Corrected Reprint

Filed November 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1821

DANNETT MADISON, on behalf of herself and others
similarly situated

v.

RESOURCES FOR HUMAN DEVELOPMENT, INC.,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 97-cv-07402
(Honorable Marvin Katz)

Argued July 14, 2000

Before: SCIRICA and McKEE, Circuit Judges,
and ACKERMAN, District Judge*

(Filed: November 15, 2000)

_____

* The Honorable Harold A. Ackerman, United States District Judge for
the District of New Jersey, sitting by designation.

GLENN A. WEINER, ESQUIRE
  (ARGUED)
PAUL G. NOFER, ESQUIRE
Klehr, Harrison, Harvey, Branzburg
 & Ellers
260 South Broad Street, Suite 400
Philadelphia, Pennsylvania 19102

 Attorneys for Appellant

JAY H. DAHLKE, ESQUIRE
  (ARGUED)
JOSHUA P. RUBINSKY, ESQUIRE
Brodie & Rubinsky
924 Cherry Street, Suite 400
Philadelphia, Pennsylvania 19107

 Attorneys for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

The issue on appeal is whether the Fair Labor Standards
Act applies to a non-profit corporation pr oviding residential
human services programs for mentally ill and mentally
retarded adults. The District Court held the FLSA applied,
and granted plaintiffs summary judgment, r elying in part
on an interpretive guideline of the Department of Labor. We
agree the FLSA applies. But in view of the Supr eme Court's
recent clarification of the amount of defer ence to be
accorded administrative agencies' infor mal statutory
interpretations, we will vacate the judgment and remand for
further findings. See Christensen v. Harris County, 529 U.S.
576, 120 S.Ct. 1655, 1662 (2000).

I. Background

Plaintiffs are current and for mer employees of Defendant
Resources for Human Development, Inc. (RHD). RHD is a
Pennsylvania non-profit corporation that pr ovides its
clients--mentally ill and mentally retar ded adults--with
human services programs such as community health

2

centers, transportation services, and community living facilities and assistance. RHD employs approximately 2,400 persons. Plaintiffs, residential advisers in RHD's "Mandela" and "Visions" programs, claimed RHD violated the FLSA by underpaying them. Specifically, they claim RHD improperly calculated their regular and overtime pay rates by failing to include in the calculation the value of the RHD employee benefits plan, which has a cash option. RHD denied coverage on the ground that its residential advisors in the Mandela and Visions programs fell within FLSA's "companionship exemption."

A. The RHD Fairshare Employee Benefit Plan

RHD provides its employees with a benefit plan--the "Fairshare Plan"--that allows employees to select benefits from a "menu" of choices including health insurance, medical reimbursement accounts, life insurance, long-term disability insurance, and cash.1 Each month, RHD contributes to each of its employees' Fairshar e accounts an amount comprising $100.00 plus seven percent of the employee's base monthly salary. Employees also may supplement their accounts to buy additional benefits. Employees who want to receive some or all benefits in cash must sign a written waiver of health insurance coverage. RHD then includes the cash amount in the employee's regular paycheck.

When calculating an employee's regular pay rate, RHD does not include its contributions to the employee's Fairshare account. RHD uses an employee's r egular pay rate to calculate any overtime pay; overtime pay is equal to 1.5 times an employee's regular pay rate.

B. RHD's Mandela and Visions Programs

RHD's Mandela and Visions programs pr ovide assistance, support, and training to mentally ill and mentally r etarded adults. Both programs are "community living arrangements" that help clients make the transition from

_____

1. Because employees can select differ ent benefits from a "menu," the plan is referred to as a "cafeteria" plan. The cash option is consistent with the Internal Revenue Code's provisions regarding cafeteria plans. See 26 U.S.C. S 125(d)(1)(B).

institutional to independent living. Each client is supported by a team assembled by the county, which includes a county case manager, mental health pr ofessionals, family members, and an RHD staff member. The county managers and other county officials monitor RHD's services to ensure they comply with a service plan. The service plan content is set by state and federal regulations. The plan itself is funded with the state and federal money that funded the client's prior institutionalization.

With the help of RHD residential advisors, clients in the Mandela and Visions programs select r esidences from a list of RHD-approved options. RHD rents the pr operty and subleases it to its clients.[2] Although utility service is arranged in clients' names, payment is made thr ough RHD. RHD prepares lists of potential roommates from which clients may choose.[3] If they wish, clients can change locations or residential advisors. Clients also may discontinue RHD's services, but then they must vacate the RHD-leased property.

Clients pay up to 72 percent of their monthly Social Security Disability payments to cover rent and other ordinary living expenses. RHD maintains a custodial account for clients' Social Security benefits; RHD is the payee of some benefit checks. For some clients who receive spending money, RHD holds and distributes the money.

Mandela clients' subleases with RHD include "house rules." House rules state: (1) no drugs, alcohol, or loud music; (2) residents be dressed if outside their bedrooms between 8:30 a.m. and 10:00 p.m.; and (3) residents keep the staff informed of their wher eabouts at all times. Visions clients' subleases have no house rules.

Clients in both programs must maintain and keep up their residences; they also may choose their home furnishings. They must choose, purchase, and prepare food for their own meals. They must maintain personal hygiene,

_____

2. In a few cases, RHD owns the property and rents it directly to program participants.

3. On occasion, the county refers clients to RHD to live with another person in the program.

4

and select and wash their own clothes. But if a client is physically or mentally unable to cook, clean, or maintain the residence, RHD employees will do so.

RHD retains keys to clients' residences. On-duty RHD employees may use the keys to enter clients' r esidents, but must knock before entering. Clients deemed capable keep their own keys. In the Mandela program, only six of eleven clients have keys to their own residences; only three are allowed to leave their residences unattended.

II. Proceedings

Dannett Madison, an RHD resident advisor , filed this class action in the United States District Court for the Eastern District of Pennsylvania on December 5, 1997. Madison claimed RHD improperly calculated overtime pay by excluding from the regular pay rate calculation: (1) Fairshare benefits payments; (2) bonuses; and (3) the 15-minute periods by which plaintiffs came to work early each day. Twenty-two additional plaintiffs opted into the class action; fourteen before the District Court issued its summary judgment decision and eight after, in accord with the FLSA's opt-in provisions.4 See 29 U.S.C. S 216(b).

RHD moved for summary judgment on three gr ounds. First, RHD claimed the FLSA wage and hours rules did not apply to plaintiffs because they fell within the "companionship exemption." That provision excludes from FLSA coverage "domestic service" employees who provide companionship services to "individuals who (because of age or infirmity) are unable to car e for themselves." 29 U.S.C.
_____

4. Four members of the class, including Madison, also filed a class action suit in Pennsylvania state court alleging RHD failed to include contributions to its employee benefit plan in its calculation of overtime pay rates; RHD failed to include yearly bonuses in its calculation of overtime pay rates; and RHD failed to pay all wages and bonuses when due.

One plaintiff, Carl Scott, filed suit in the Eastern District of Pennsylvania alleging retaliation by RHD for having opted in to this class action. A bench trial in that case resulted in judgment for RHD which is currently being appealed.

S 213(a)(15). Second, RHD contended its benefit plan was a bona fide health and welfare benefits plan, and thus its payments properly were excluded fr om the regular pay rate calculation. See 29 U.S.C. S 207(e)(4).5 Third, RHD argued bonuses need not be included in the calculation of the regular rate of pay. See 29 U.S.C.S 207(e)(3). Plaintiffs opposed the motion, but did not file their own cr oss-motion for summary judgment.

On January 8, 1999, the District Court granted in part and denied in part RHD's motion for summary judgment. The court found there were no material factual disputes on the application of the FLSA and of S 213(a)(15) and S 207(e)(4). See Madison v. Resour ces for Human Development, Inc., Civ. No. 97-7402, slip op. at 4 n.4 (E.D. Pa. Jan. 8, 1999). The court also held as a matter of law RHD could not claim the companionship exemption and the bona fide plan exclusion. See id. at 18. The parties settled the 15 minutes issue and stipulated to the amount of damages and prospective relief on the benefits issue.6

In June 1999, on RHD's motion, the District Court closed the class, and in September 1999 entered judgment in favor of 17 plaintiffs. RHD appealed.

We have jurisdiction under 28 U.S.C. S 1291. Our review of summary judgment is plenary. We view all evidence and draw all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. See Whiteland Woods, L.P . v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir . 1999). Our review of the district court's interpretation of the FLSA is plenary. See, e.g., Stephens v. Kerrigan, 122 F .3d 171, 176 (3d Cir. 1997).

_____

5. "[T]he "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include. . . (4) contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for pr oviding old-age, retirement, life, accident, or health insurance, or similar benefits for employees . . . ." 29 U.S.C. S 207(e)(4).

6. The District Court granted RHD summary judgment with respect to the bonus issue. See Madison, Civ. No. 97-7402, slip op. at 18.

6

III. Discussion

A. The District Court Complied With
        Fed. R. Civ. P. 56

A threshold issue is whether the District Court complied with Federal Rule of Civil Procedure 56 in deciding RHD's summary judgment motion. The District Court concluded plaintiffs "are not employees exempted from FLSA coverage by the companion exemption, so RHD's overtime payment must comply with FLSA's rules." Madison, Civ. No. 97-7402, slip op. at 18. RHD asserts the decision constituted a sua sponte summary judgment in Madison's favor , without the notice required by Rule 56. 7 RHD is correct that "a district court may not grant summary judgment sua sponte unless the court gives notice and an opportunity to oppose summary judgment." Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 910 (3d Cir. 1994). But that did not happen here.

Faced with RHD's motion for summary judgment, the District Court decided whether RHD was entitled to judgment as a matter of law under 29 U.S.C. S 213(a)(15). In addressing the motion, the court found no dispute of material fact with respect to whether FLSA and its companionship exemption applied (a conclusion neither party contests), and concluded as a matter of law RHD was not entitled to judgment under that provision. In rejecting RHD's asserted affirmative defense, the District Court held RHD could not, as a matter of law, meet its bur den of proof. See Madison, Civ. No. 97-7402, slip op. at 4.

Holding RHD could not prevail as a matter of law, on what RHD apparently considered one of its strongest affirmative defenses, does not mean the court improperly granted summary judgment to plaintiffs. The District Court's judgment left intact RHD's other affir mative defenses (statute of limitations, laches, waiver , estoppel,

_____

7. Defendant argues the same with r espect to the District Court's conclusion that RHD's Fairshare Plan was not exempted from the regular pay rate calculation under 29 U.S.C. S 207(e)(4). Given our disposition of that issue, we need not address RHD's summary judgment argument with respect to S 207(e)(4). See  discussion infra.

7

good faith) that RHD was free to pursue. Indeed, the court did not enter judgment for plaintiffs until nine months after denying in part RHD's summary judgment motion. RHD appealed only after the parties stipulated to damages and prospective relief, and settled other claims. We see no violation of Rule 56.

B. The FLSA Companionship Exemption

1. Interpreting "domestic service employment"

The District Court held the FLSA companionship exemption did not apply to RHD's Mandela and V isions employees. That provision excludes from FLSA minimum wage and maximum hours rules:

> [A]ny employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms ar e defined and delineated by regulations of the Secretary) . . . .

29 U.S.C. S 213(a)(15). The statute does not define "domestic service employment." To construe the exemption, the District Court relied on 29 C.F.R.S 552.3, which defines "domestic service" as

> services of a household nature perfor med by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed. The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs . . . . This listing is illustrative and not exhaustive.

The District Court understood this regulation to mean the exemption applied only to employees who "per form household services in a private home." See Madison, Civ. No. 97–7402, slip op. at 3. The District Court then concluded RHD could not establish that its clients' homes were "`private' within the meaning of the statute." Id. at 4.

We agree with the District Court's r eliance on 29 C.F.R.

8

S 552.3 to determine the meaning of"domestic service." We also agree that in order for services to constitute a "domestic service" under Section 552.3, they must be provided in "private homes."8  But there is scant regulation, legislative history, or case law to guide deter mination of whether the living arrangements here constitute"private homes."

   2. Regulatory, legislative, and case law
   interpretations of "private home"

The pertinent regulation discussing "private home" as used in 29 C.F.R. S 552.3 is not dispositive. It provides:

   (a) The definition of "domestic service employment" contained in S 552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.1057) and from "the generally accepted meaning" of the term. Accordingly, the term includes persons who are frequently referred to as "private household workers." See S. Rep. 93-690, p. 20. The domestic service must be performed in or about the private home of the employer whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation. A separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home.

   (b) Employees employed in dwelling places which ar e primarily rooming or boarding houses ar e not considered domestic service employees. The places

_____

8. Neither party disputes the role 29 C.F .R. SS 552.3 and 552.101 should play in our construction of 29 U.S.C. S 213(a)(15). If, as is the situation
here, the underlying statute is ambiguous, we afford deference to formal agency regulations resulting from notice and comment rule making construing the statutory provision unless those regulations constitute an impermissible interpretation of the statute. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). There is no dispute the regulations construing 29 C.F .R. S 213(a)(15) are formal regulations. We find the pertinent r egulations to be reasonable and thus are guided by their definitions in our construction of the "companionship exemption."

where they work are not private homes but commercial or business establishments. Likewise, employees employed in connection with a business or pr ofessional service which is conducted in a home (such as a r eal estate, doctor's, dentist's or lawyer's office) ar e not domestic service employees. . . .

29 C.F.R. S 552.101. Although the r egulation provides some guidance as to what constitutes a "private home," it does not settle the question.

The legislative history is similarly unhelpful. In discussing changes to the FLSA intended to cover domestic service employees--which in turn created the need for the companionship exemption at issue here--the House Report accompanying the 1974 Amendment to the FLSA noted:

The domestic service must be performed in a private home which is a fixed place of abode of the individual or family. A separate and distinct dwelling maintained by the individual or family in an apartment house or hotel may constitute a private home. However , a dwelling house used primarily as a boarding or lodging house for the purposes of supplying such services to the public, as a business enterprise, is not a private home.

House Rep. No. 93-913 reprinted in 1974 U.S.C.C.A.N. 2811, 2845. This discussion of "private home" does not provide a definitive answer either.

The case law is divergent. In Terwilliger v. Home of Hope, Inc., 21 F. Supp. 2d 1294 (N.D. Okla. 1998), the United States District Court for the Northern District of Oklahoma faced a similar factual scenario. See id. at 1297-1298. Holding the homes in question were private, the court in Terwilliger noted the defendant did not acquire either the residence or the furniture for the client; 22% of the homes were owned by the client or the client's par ent or guardian, with the remainder rented or leased fr om third parties in the client's name; the defendant did not co-sign the lease and had no property interest in the client's residence; the defendant had keys to the residences only for emergency or consensual use; and the defendant paid rent fr om the client's trust account. Id. at 1300. The Terwilliger court

10

distinguished its holding from that in Linn v. Dev. Svcs., 891 F. Supp. 574 (N.D. Okla. 1995). Linn held homes were not "private homes" because the defendant acquired the homes and furniture; maintained keys to the homes; decided how many and which clients lived in the homes; frequently signed leases for the clients; and r eceived state money on the clients' behalf, which it then used to pay rent on the clients' behalf. Linn, 891 F. Supp. at 579. Terwilliger differed because the defendant ther e did not acquire the residences in question, maintained keys to the homes only for emergency and consensual use, and did not decide where and with whom clients would live. See id. at 1300. Thus, the homes in Terwilliger wer e held to be private. See id. at 1300.

The Utah Supreme Court also has consider ed when domestic services are provided in a "private home" and therefore covered by the FLSA companionship exemption. That court applied four factors to reach its decision: (1) the facility's source of funding; (2) the public's degree of access to the facility; (3) the facility's status as a for –profit or not-for-profit organization; and (4) the size of the organization. See Bowler v. Deseret Village Ass'n, Inc., 922 P.2d 8, 13–14 (Utah 1996). Applying its test, the Court found the defendant, a "privately funded, nonprofit Utah corporation which provides a residential and vocational `development habitation' for fourteen marginally mentally and physically handicapped adults," was "more like a`private home' than an `institution' or a business enterprise." Id. at 11, 14.

We conclude that none of these cases, nor the relevant administrative and legislative material, provides clear guidance in this matter. What is clear is that the determination of what constitutes a "private home" in the context of the FLSA companionship exemption must be made on a case–by–case basis, taking into account all aspects of the living arrangements.

     3. The Mandela and Visions programs residences are not "private"

We construe FLSA exemptions narrowly against the employer. See Mitchell v. Kentucky Fin. Co., 359 U.S. 290,

295 (1959); Reich v. Gateway Press, Inc. , 13 F.3d 685, 694 (3d Cir. 1994). The District Court concluded, as a matter of law, that RHD had not overcome its significant burden in establishing its affirmative defense. W e agree.

Several aspects of the Mandela and Visions living arrangements support the District Court's conclusion that the companionship exemption does not apply. For example, RHD clients do not have a possessory interest in their RHD homes. The right of RHD clients to remain in their housing depends completely on their continued relationship with RHD. If clients terminate that relationship, they cannot remain in RHD housing. This is not the kind of possessory interest individuals enjoy in a private home.

RHD clients do not have full control over others' access to their RHD homes. RHD retains keys to the homes of all clients in the Mandela and Visions pr ogram. Indeed, RHD keeps the only set of keys with respect to nearly half the clients in the Mandela program. Less than half of the clients in that program (five of eleven) have keys to their houses.

RHD clients do not have unfettered freedom in their day-to-day conduct. They must comply with rules that do not typically apply to adults in private homes. One such rule requires RHD clients to be dressed when outside their rooms between the hours of 8:30 a.m. and 10:00 p.m. This rule is incongruous with the notion of a "private home."9

Given the contours of the living arrangements at issue here, and the rule that FLSA exemptions should be narrowly construed against the employer , we conclude as a matter of law the RHD residences are not"private homes"

---

9. As noted by the District Court, Terwilliger differs from this case in important respects. See Madison, Civ. No. 97-7402, slip op. at 8. In Terwilliger, the court placed a significant emphasis on the nature of the possessory interest clients had in the pr operty in question. The clients there had either an ownership or direct lessee interest in the property. See Terwilliger, 21 F. Supp. 2d at 1299-1300. In contrast, RHD's clients have significant restrictions placed on their interest and rights concerning the property. They sublease the property from RHD, and their right to remain on the property is tied directly to their continued involvement in the RHD-administered program.

12

for purposes of S 213(a)(15). We will affirm the District
Court's holding that the FLSA applies to the plaintiffs'
employment relationship with RHD.

We now turn to the question whether RHD's
contributions to the Fairshare accounts should be included
in plaintiffs' regular and overtime pay rates.

C. Applying FLSA to RHD's Fairshare Account
        Contributions

FLSA requires overtime pay to be at least 1-1/2 times the
"regular rate" of pay. See 29 U.S.C. S 207. Section 207(e)(4)
provides the "regular rate" includes all remuneration paid
to, or on behalf of, the employee, but does not include:

> (4) contributions irrevocably made by an employer to a
> trustee or third person pursuant to a bonafide plan for
> providing old-age, retirement, life, accident, or health
> insurance, or similar benefits for employees . . ..

29 U.S.C. S 207(e)(4).

The District Court concluded RHD's contributions to the
Fairshare accounts were not excludable under S 207(e)(4).
The court based its analysis on 29 C.F.R.S 778.215(a)(5),
which provides:

> (a) General Rules. In order for an employer's
> contributions to qualify for exclusion from the regular
> rate under section 7(e)(4) of the Act, the following
> conditions must be met:
>
> . . .
>
> (5) The plan must not give an employee the right to
> assign his benefits under the plan nor the option to
> receive any part of the employer's contributions in
> cash instead of the benefits under the plan: Provided,
> however, That if a plan otherwise qualified as a bona
> fide benefit plan under section 7(e)(4) of the Act, it
> will still be regarded as a bona fide plan even though
> it provides, as an incidental part ther eof, for the
> payment to an employee in cash of all or a part of
> the amount standing to his credit (i) at the time of
> the severance of the employment relation due to
> causes other than retirement, disability, or death, or

13

> (ii) upon proper termination of the plan, or (iii) during the course of his employment under 655<!>circumstances specified in the plan and not
>
> inconsistent with the general purposes of the plan to provide the benefits described in section 7(e)(4) of the Act.

RHD claims the District Court erred in r elying on this regulatory provision because the gover ning statutory authority, 29 U.S.C. S 207(e)(4), is not ambiguous. It also argues that because the Administrator who issued 29 C.F.R. S 778.215(a)(5) did not have delegated authority to interpret S 207(e)(4), "the Administrator's interpretation may be considered only if it is a well-reasoned, persuasive interpretation of S 207(e)(4) consistent with congressional intent." Even if 29 C.F.R. S 778.215(a)(5) governs, RHD insists its Fairshare Plan conforms with the Administrator's dictates.

We agree S 207(e)(4) is ambiguous in this context. But we will vacate the District Court's denial of summary judgment for failure properly to analyze 29 C.F .R. S 778.215(a)(5). The District Court treated S 778.215(a)(5) as a formal agency regulation, when it is not.10 Section 778.215(a)(5) is merely an interpretative guideline of the agency.

### 1. FLSA S 207(e)(4) is ambiguous

It is well-settled that if a statute unambiguously expresses Congress's intent, courts must give effect to that intent. See, e.g., FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 1297 (2000) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)). RHD argues S 207(e)(4) is clear and unambiguous, because although the statute does not define "bona fide," that term has an ordinary usage. Relying on Black's Law Dictionary and Random House Webster's Unabridged Dictionary, RHD contends "bonafide" means "good faith." It argues there is nothing to suggest its

_____

10. Because we will remand for the District Court to examine the administrative provision under the proper deference standard, we need not reach RHD's final argument that the Fairshare Plan conforms with the dictates of S 778.215(a)(5).

14

Fairshare Plan is anything but a good faith attempt to provide its employees with benefits.

Assuming arguendo that "bona fide" does not render S 207(e)(4) ambiguous, we cannot say the same of the remainder of the provision. As noted, the section allows exclusion of contributions to plans that provide "old-age, retirement, life, accident, or health insurance, or similar benefits for employees." 29 U.S.C. S 207(e)(4). The "or similar benefits" language is imprecise by its own terms and capable of ambiguity. Therefore, we hold the plain language of S 207(e)(4) does not provide sufficient guidance to govern the application of the statute in this case.

   2. The weight of authority of 29 C.F.R.
   S 778.215(a)(5)

In light of the statutory ambiguity, we must examine 29 C.F.R. S 778.215(a)(5) for guidance, and determine what deference, if any, it is owed in our construction of the statute. See Cleary v. Waldman, 167 F .3d 801, 808 (3d Cir. 1999) cert. denied. 120 S.Ct. 170. That deter mination is crucial because formal agency regulations receive more deference than mere interpretive guidelines. See Christensen v. Harris County, 529 U.S. 576, 120 S.Ct. 1655, 1662 (2000) ("Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law--do not warrant Chevron-style deference.").

   a. 29 C.F.R. S 778.215(a)(5) is an interpretive
   guideline.

The District Court appears to have interpreted 29 C.F.R. S 778.215(a)(5) as a formal agency regulation.11 See, e.g., Madison, Civ. No. 97-7402, slip op. at 11 (r eferring to 29 C.F.R. S 778.215(a)(5) as a "Department of Labor regulation[ ]"). But Section 778.215(a)(5) is not a formal administrative regulation. This is made clear by 28 C.F.R.

_____

11. The District Court did not explicitly addr ess the level of deference that it applied to S 778.215(a)(5).

15

S 778.1, which lays out the purpose of Part 778 of the Code of Federal Regulations. Section 778.1 provides:

> This Part 778 constitutes the official interpretation of the Department of Labor with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Act. It is the purpose of this bulletin to make available in one place the interpretation so these provisions which will guide the Secretary of Labor and the Administrator in the performance of their duties under the Act unless they are otherwise directed by authoritative decisions of the court or conclude, upon reexamination of an interpretation, that it is incorrect. These official interpretations are issued by the Administrator on the advice of the Solicitor of Labor, as authorized by the Secretary.

29 C.F.R. S 778.1. Section 778.1 leaves no doubt that S 778.215(a)(5) is an interpretive guideline, issued on the advice of the Solicitor of Labor and authorized by the Secretary, not an official regulation promulgated after notice-and-comment rule making.

> b. Under Christensen v. Harris County, informal agency interpretations are not binding, but are entitled to respect to the extent they are persuasive.

We have made clear that agency interpretive guidelines "do not rise to the level of a regulation and do not have the effect of law." Brooks v. Village of Ridgefield Park, 185 F.3d 130, 135 (3d Cir. 1999). The Supreme Court recently clarified the distinction between the level of deference to be accorded formal agency regulations and informal agency interpretations. In Christensen v. Harris County, 529 U.S. 576, 120 S.Ct. 1655 (2000), the Court explained that informal agency interpretations in "opinion letters and similar documents" are not entitled to Chevron deference.[12]

_____

12. As noted, Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), held courts must defer to an agency's regulation interpreting an ambiguous statute, if the statute is one the agency is charged to administer.

16

Instead, they are "entitled to respect" under Skidmore v. Swift, 323 U.S. 134 (1944), but only to the extent they have the "power to persuade."13  Christensen, 529 U.S. 576, 120 S.Ct. at 1663. To grant Chevron deference to informal agency interpretations would unduly validate the results of an informal process.

The Supreme Court's clarification in Christensen requires us to revisit our previously applied parameters of deference. See, e.g., United States v. Occidental Chemical Corp., 200 F.3d 143, 151–52 (3d Cir. 1999) (following Cleary; court must defer to agency's statutory interpretation that find support in informal agency practice); Br ooks v. Ridgefield Park, 185 F.3d at 135 (agency's interpr etive bulletins do not have the effect of law; level of defer ence due is governed by bulletin's persuasiveness); Cleary, 167 F .3d at 808 (agency's informal interpretation is accorded deference if agency is charged to interpret the statute, if the interpretation is consistent with agency's other pronouncements, and if the interpretation furthers the statute's purposes). Christensen now confirms that informal agency interpretations are entitled to r espect based only on their persuasiveness. So that the District Court may apply this standard, we will remand this case for a determination of the "power to persuade" of S 778.215(a)(5) and the extent to which it is "entitled to respect" in interpreting FLSA S 207(e)(4).

As to the persuasiveness of agency interpretive guidelines, we note our continued reliance on the framework laid out in Skidmore v. Swift , 323 U.S. 134 (1944). See, e.g., Cleary, 167 F .3d at 809. The Skidmore Court explained:

> [R]ulings, interpretations and opinions of the Administrator under this Act, while not contr olling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly r esort for

_____

13. As the Supreme Court noted, defer ence to agency interpretation is appropriate for an agency's interpretation of its own regulation where the regulation itself is ambiguous. Christensen , 529 U.S. 576, 120 S.Ct. at 1663. That is not the case here.

guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to contr ol.

Skidmore, 323 U.S. at 140. In applying the Skidmore test, the Supreme Court has noted that agency interpr etations issued contemporaneous with a statute are entitled to greater deference. See, e.g., Public Citizen v. Department of Justice, 491 U.S. 440, 463 n.12 (1989) (one r eason deference was not due an agency interpr etation was the passage of time between enactment of the statute and promulgation of the regulation in question); General Electric Co. v. Gilbert, 429 U.S. 125, 142 (1976) (EEOC guideline did not "fare well" under Swift standards in part because it was "not a contemporaneous interpretation"). An agency interpretation's persuasiveness also is derived in part from the "thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." Skidmore, 323 U.S. at 140. To be persuasive, an agency interpretation cannot run contrary to Congress's intent as reflected in a statute's plain language and purpose. See Cleary, 167 F.3d at 808.

### 3. FLSA presumes remuneration is to be included in the regular pay rate

We make a final observation. RHD ar gues Christensen stands for the proposition that unless a r elevant FLSA provision expressly or implicitly pr ohibits the employer's policy, an employee cannot demonstrate a statutory violation. That argument stretches Christensen in unconvincing fashion. The Court in Christensen  was concerned with whether the FLSA prohibited municipal employers from compelling the use of compensatory time. See Christensen, 529 U.S. 576, 120 S.Ct. at 1658. The Court read the applicable provisions of the FLSA only to "guarantee that an employee will be able to make some use of compensatory time when he requests to use it." Id. at 1662. The Court found the provision silent with respect to the employer's requiring employees to use compensatory

18

time. See id. ("[T]hat provision says nothing about restricting an employer's efforts to r equire employees to use compensatory time.").

But here, the FLSA expressly provides the regular rate of pay "shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee" unless it falls under a specific exemption. See 29 U.S.C. S 207(e). Unlike in Christensen, there is a statutory presumption here that remuneration in any form is included in the regular rate calculation. The burden is on the employer to establish that the remuneration in question falls under an exemption. Unlike in Christensen, the statutory silence in Section 207(e)(4) relied on by RHD cuts against it rather than in its favor. In short, Christensen does not compel summary judgment for RHD.

IV. Conclusion

For the foregoing reasons, we will vacate the District Court's grant of summary judgment and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19