

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-2005

# Packard v. Pgh Transp Co

Precedential or Non-Precedential: Precedential

Docket No. 03-3088

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Packard v. Pgh Transp Co" (2005). *2005 Decisions.* Paper 612.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/612

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT

No. 03-3088

CAROL PACKARD, JAMES SINCLAIR, HOWARD
BOOKER, FLORENCE MARIE CAMP, EMANUEL A.
BRATTEN, RONALD E. DOMINICI, CHARLES R.
ROTHERT, SR., RAYMOND DAVIS, DONALD S. SPADE,
BEVERLY J. BENNETT, RANDER J. THOMPSON,
DARRYL SIGEL, LAVERA RAWLINGS, LEROY F.
WISE, DAVID L. MORRIS, EDWARD R. CROSBY,
GERALDINE REINHEIMER, PATRICIA ZILCH,
SHANNON MCGRATH, DARRYL TURNER, and
NORBERT G. ABEL, Plaintiffs-Appellees

v.

PITTSBURGH TRANSPORTATION CO.,
Defendant-Appellant

On Appeal from the U.S. District Court for the
Western District of Pennsylvania
(D.C. Civil No. 02-89)
District Judge: The Honorable Arthur J. Schwab
_____

Argued  December 15, 2004

Before: **NYGAARD and GARTH, <u>Circuit</u> <u>Judges</u>, and POLLAK,[*] <u>District</u> <u>Judge</u>.

(Opinion Filed:  August 12,  2005)
_____

OPINION OF THE COURT
_____

RAY F. MIDDLEMAN, Esq. (argued)
CLIFFORD R. MEADE, Esq.
Malone, Larchuk & Middleman P.C.
117 VIP Drive, Suite 310
Wexford, PA 15090

     *Attorneys for Appellant*
     *Pittsburgh Transportation Company*

ERNEST B. ORSATTI, Esq. (argued)
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

     *Attorney for Appellees*
     *Carol Packard, et al.*

_____

    [*]Honorable Louis H. Pollak, Senior District Judge for the United States District Court of the Eastern District of Pennsylvania, sitting by designation. **Honorable Richard L. Nygaard assumed senior status on July 9, 2005

THEODORE R. SCOTT, Esq.
Luce, Forward, Hamilton & Scripps LLP
11988 El Camino Real, Suite 200
San Diego, CA 92130

> *Attorney for Amicus Curiae*
> *Laidlaw Transportation Services, Inc.*

POLLAK, District Judge:

In this appeal, appellant-defendant Pittsburgh Transportation Co. ("PTC") seeks to establish that drivers for its ACCESS transit service ("ACCESS drivers"), including plaintiffs-appellees, are not eligible for overtime under the Fair Labor Standards Act ("FLSA"). The precise question before us is whether the ACCESS drivers, who would ordinarily be eligible for overtime, become ineligible by virtue of a provision of the Motor Carrier Act ("MCA") that vests authority in the Secretary of Transportation to regulate certain aspects of interstate transport. Those within the Secretary's sphere of authority under the MCA are excluded from the overtime

3

provisions of the FLSA. The District Court concluded that this so-called "MCA exemption" from the FLSA was not applicable here, and that the ACCESS drivers therefore remained eligible for overtime pay. We agree with that conclusion, although we reach it by a different route, and will affirm the judgment of the District Court.

I.

PTC's ACCESS service, not available to the general public, provides transportation to elderly and disabled persons who are unable to use other forms of public transportation. Under a contract with ACCESS Transportation Systems, Inc., a federally-funded program to provide such services, PTC's ACCESS program serves roughly 5,000 people with disabilities and 125,000 seniors. Most of these passengers have "unconditional" eligibility, which requires a certification of need based on review by a special panel, while others are eligible

4

based on certain more temporary conditions.

PTC provides ACCESS service within a defined service area in Allegheny County that includes the Pittsburgh Amtrak and Greyhound stations. PTC also provides some ACCESS service to and from the Pittsburgh International Airport, which is outside its regular service area. PTC's ACCESS service operates entirely within Pennsylvania, and ACCESS drivers do not transport passengers across state lines. It is unclear what portion of ACCESS service involves train or bus terminals. Trips to the airport are a very minor part of ACCESS's aggregate operations,[2] but it is the case that most, if not all, of the ACCESS drivers have made at least a few trips to the airport. Because PTC assigns the airport trips indiscriminately

---

[2]During 2001 and 2002, airport trips were almost always made by a separate ACCESS provider, Airbus, but the ACCESS drivers still made such trips occasionally.

5

along with other trips, any ACCESS driver may be called upon to drive such trips.

Unlike conventional bus systems, PTC's ACCESS service does not have regular, set routes, or set stops or schedules from day to day. Rather, PTC schedules passengers' trips each day to provide the most efficient service possible. To use the service, eligible passengers must schedule their trips at least one day in advance, by telephoning schedulers at either PTC or ACCESS. Although limited same-day trips may also be scheduled when space is available, ACCESS drivers do not pick up or drop off passengers except as scheduled in advance through the central schedulers. A passenger purchases a ticket for the service in advance, presenting the ticket to the ACCESS driver as payment. Tickets for ACCESS service are not linked in any way to tickets for interstate travel, or indeed intrastate travel, on non-ACCESS transit services.

Because PTC contends that its ACCESS drivers are excluded from the FLSA's overtime protection, it has refused to pay the drivers more than their ordinary hourly wage when they work more than 40 hours per week. It is undisputed that the drivers regularly work over 40 hours per week, and that they are entitled to recover overtime compensation for the excess hours if they are not subject to the FLSA's MCA exemption.

After the ACCESS drivers filed this action in the United States District Court for the Western District of Pennsylvania, seeking to confirm their entitlement to FLSA overtime pay, both parties filed motions for partial summary judgment on the question of the drivers' entitlement to overtime protection. The District Court denied PTC's motion, and granted the ACCESS drivers' motion in part.

The District Court ruled that the ACCESS drivers were not excluded from the protections of the FLSA, and remained

entitled to overtime, because they were not within the Secretary of Transportation's authority to regulate interstate transport. According to the District Court, the ACCESS drivers were not engaged in interstate transport because the ACCESS service (which does not physically provide transport outside of Pennsylvania) does not involve "through ticketing" arrangements with interstate transport.

The court then entered final judgment for the ACCESS drivers, based on the parties' stipulation as to the amount of compensatory damages and the court's determination of appropriate liquidated damages and attorneys' fees. PTC timely filed this appeal, challenging the underlying liability determination.

The issues presented here have also been raised, but not decided, in three actions in the Western District of Pennsylvania involving ACCESS drivers for PTC and for another

8

transportation company in the Pittsburgh area, Laidlaw Transportation, Inc. ("Laidlaw"). One of these actions, *Eugene J. Kott, et al. v. Pittsburgh Transportation Co.*, No. 02-0089, has been dismissed without prejudice pending the resolution of this appeal. In *Spivak v. Pittsburgh Transportation Co.*, No. 98-984 (W.D. Pa. May 28, 1999), the District Court found that PTC could apply the MCA exemption to plaintiff Machall Spivak, an ACCESS driver. However, because Spivak did not dispute that he was engaged in interstate transportation while making airport trips, the *Spivak* decision does not directly address the issues presented here. In the third action, *Greenwood v. Laidlaw Transit Services, Inc.*, No. 01-0728, the District Court has denied both parties' motions for summary judgment. Laidlaw has submitted an amicus brief supporting PTC's position on this appeal.

II.

9

Our review of the District Court's grant of partial summary judgment is plenary. *Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 180 (3d Cir. 2000).

III.

Appellant PTC seeks reversal of the District Court's grant of partial summary judgment to its ACCESS drivers, as to liability on the drivers' claims for overtime pay under Section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1). PTC claims that the drivers are exempt from the FLSA's overtime requirements under the Motor Carrier Act ("MCA") exemption, set forth at 29 U.S.C. § 213(b)(1). It is well settled that exemptions from the FLSA are construed narrowly, against the employer. *Madison*, 233 F.3d at 183. Accordingly, PTC bears the burden of proving "plainly and unmistakably" that the drivers qualify for the MCA exemption. *See Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 412 (3d

10

Cir. 1992).

*A. The Statutes*

Section 7 of the FLSA requires employers to pay overtime compensation to employees who work more than forty hours per week, unless one or another of certain exemptions applies. 29 U.S.C. § 207. The exemption said by PTC to be applicable here, the MCA exemption, appears in Section 13(b)(1) of the FLSA, and provides that overtime pay is not required for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).

Section 31502 of Title 49 "applies to transportation . . . described in sections 13501 and 13502 of [Title 49]." 49 U.S.C. § 31502. In turn, Section 13501 of Title 49 provides in relevant part that the Secretary and the Surface Transportation Board

11

have jurisdiction "over transportation by motor carrier . . . to the extent that passengers, property, or both, are transported by motor carrier between a place in . . . a State and a place in another State."  49 U.S.C. § 13501.[3]  Our task is to determine whether the ACCESS drivers' work brings them within the

[3]The complete text of Section 13501 reads as follows:
The Secretary [of Transportation] and the [Surface Transportation] Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier--
(1) between a place in--
(A) a State and a place in another State;
(B) a State and another place in the same State through another State;
(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

scope of this statutory authority.

*1. The District Court's Ruling*

The District Court found that the ACCESS drivers were not within the authority of the Secretary of Transportation. The District Court determined that, in general, the Secretary's authority extends to transportation in which there is "practical continuity of movement" across state lines. In applying this concept to the ACCESS drivers' situation, though, the District Court adopted a particular, narrow interpretation of that term.

The District Court found that "[t]he DOL [Department of Labor], in consultation with the DOT [Department of Transportation], addressed the issue of 'practical continuity of movement' as applied to intrastate bus drivers in a 1999 opinion letter, which adopted the reasoning of a 1974 DOT ruling. In the letter, John R. Fraser, Acting Administrator of the Wage and

13

Hour Division, U.S. Department of Labor, asserts that intrastate bus drivers would always be eligible for FLSA overtime compensation, except in one situation not applicable here." The District Court then quoted the following passage from the Fraser letter:

> Section 204 [the predecessor to 49 U.S.C. § 31502][4] does not apply merely because the operation makes stops at airports, railroad stations or bus depots and picks up passengers who have had or will have a prior or subsequent interstate journey. The only case in which section 204 would apply to a local bus operation transporting passengers who have made or will make a prior or subsequent journey across a State line is one in which there is a through ticketing arrangement under which the passengers purchase a single ticket which is good for both the local bus ride and the subsequent interstate journey.

After acknowledging that "the DOT, not the DOL, has

_____

[4]Section 204 of the MCA, like the current 49 U.S.C. § 31502, defined the range of transportation activities subject to DOT authority and therefore not protected by the FLSA.

14

the authority to interpret the DOT's power under the MCA,"[5] the District Court went on to find that "the DOL's interpretation must be given deference because the DOL and the DOT agree on the interpretation." Because there is admittedly no "through ticketing arrangement" covering ACCESS passengers who also travel interstate, the District Court found that the MCA exemption did not apply, and that the ACCESS drivers remained eligible for overtime pay.

In appealing the District Court's ruling, PTC challenges the "through ticketing" test. To assess the "through ticketing" test, we will examine the sources on which the District Court relied.

---

[5]The DOL has no independent authority to interpret the MCA, even though the MCA defines the scope of an FLSA exemption, because the DOL is not the agency entrusted with the administration of the MCA. *See Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 411 n.3 (3d Cir. 1992).

15

First, looking back to 1974, it appears that what the District Court referred to as "a 1974 DOT ruling" whose "reasoning" was "adopted" by the DOL was in fact an unofficial interagency letter. On July 8, 1974, one Isaac Benkin, then Assistant Chief Counsel for Motor Carrier and Highway Safety Law at the DOT, wrote a letter (the "Benkin letter") to the DOL's Division of Minimum Wage and Hour Standards, purporting to answer several questions from the DOL about the scope of the DOT's authority. One of the questions was the following:

> Does section 204 of the Motor Carrier Act [which then defined the aspects of the Secretary of Transportation's authority relevant here] apply to privately operated transit systems utilizing motorbuses operating over fixed routes which may cross State lines or have stops or terminals at airports, railroad stations, or interstate bus depots?

16

Mr. Benkin's answer to this question, in its entirety, read as follows:

> Section 204 applies if the bus operations are conducted across a State line. Section 204 does not apply merely because the operator makes stops at airports, railroad stations or bus depots and picks up passengers who have had or will have a prior or subsequent interstate journey. The only case in which section 204 would apply to a local bus operation transporting passengers who have made or will make a prior or subsequent journey across a State line is one in which there is a through ticketing arrangement under which the passengers purchase a single ticket which is good for both the local bus ride and the prior or subsequent interstate journey by air, rail, or bus.

Mistakenly referring to the Benkin letter as a "ruling by the U.S. Department of Transportation (DOT)," Mr. Fraser of the DOL relied on it twenty-five years later in two 1999 opinion

17

letters stating that certain categories of drivers apparently akin to the appellees in the case at bar were not within the MCA exemption, and were therefore subject to the FLSA's overtime requirements. The District Court, in turn, relied on one of these DOL letters because the District Court found that the DOT shared the DOL's interpretation. However, neither the 1974 Benkin letter nor the 1999 Fraser letter the District Court relied on has the formality and weight that would merit judicial deference.[6]

Some agency interpretations of statutes the agency administers are entitled to substantial judicial deference. Here, the ACCESS drivers contend that Mr. Benkin's endorsement of a "through ticketing" test is entitled to deference under *Chevron*

___

[6]One of the DOL letters also stated that the DOL had "confirmed with DOT that this ruling ha[d] not since been superceded." This undocumented recital cannot be entitled to deference as an official DOT interpretation.

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which requires judicial deference to an agency's reasonable interpretation of an ambiguous statute entrusted to its administration. However, "[i]nterpretations such as those in opinion letters - like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law - do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). The informal and cursory Benkin letter falls into this category, and hence does not merit *Chevron* deference. The Fraser letter would similarly lack authority, even if the DOL had authority to interpret the MCA, which it does not. As this court has said, "[t]o grant *Chevron* deference to informal agency interpretations would unduly validate the results of an informal process." *Madison*, 233 F.3d at 186.

In the absence of *Chevron* deference, the ACCESS

19

drivers contend that the Benkin letter is at least entitled to the lesser degree of deference called for by *Skidmore v. Swift*, 323 U.S. 134 (1944). However, *Skidmore* deference is available only based on an agency interpretation's power to persuade. The general rule, where *Chevron* deference is not warranted, is that "[t]he weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade if lacking power to control." *Skidmore*, 323 U.S. at 140. The materials at issue here simply provide no reasoning or analysis that a court could properly find persuasive.

Accordingly, we are of the view that the "through ticketing" test utilized by the District Court is not a legal standard that suffices to determine whether the MCA exemption is applicable to the ACCESS drivers. We turn, then, to other

20

sources of guidance.

*B. Analysis*

Setting aside the "through ticketing" test, we will inquire whether guidance is forthcoming from (a) DOT regulations, or lack thereof, or (b) case law addressing analogous questions.

*1. Regulatory Framework*

PTC maintains that a definition of interstate commerce in DOT regulations unambiguously subjects the ACCESS drivers to the Secretary's authority. The DOT has defined interstate commerce as "trade, traffic, or transportation . . . between two places in a State *as part of* trade, traffic, or transportation originating or terminating outside the State or the United States." 49 C.F.R. § 390.5 (emphasis added). However, even if this definition of "interstate commerce" may be used as a form of shorthand for the MCA's specific language (in 49 U.S.C. §

21

13501),[7] the DOT's regulation is not dispositive one way or another, since it provides no instruction as to what activity is "part of" interstate commerce in marginal situations such as that presented here.[8]

The ACCESS drivers contend that they are not within the MCA exemption because the Secretary of Transportation has never in fact regulated their work. However, the MCA exemption depends only on the existence of secretarial authority, not on its exercise. *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678 (1946); *Morris v. McComb*, 332 U.S. 422, 434 (1947);

---

[7]See text at note 3, *supra*.

[8]PTC and Laidlaw also refer us to DOL regulations defining the sphere of interstate commerce that is subject to the FLSA. These regulations could be, at best, persuasive. See *supra* note 5. However, the regulations themselves note that the MCA's definition of interstate commerce is "not identical with the definitions in the [FLSA]," 29 C.F.R. § 782.7(a), and has been more narrowly interpreted by the courts than the parallel definition in the FLSA, 29 C.F.R. § 782.7(b)(1). Thus, they do not help us here.

22

*Friedrich*, 974 F.2d at 416. Thus, it does not matter that the ACCESS drivers' vehicles are below the weight threshold above which the Secretary's safety regulations apply, as the District Court found that they are, or whether the drivers are exempt from the Secretary's regulations for any other reason. *See id.*; *Martin v. Coyne Int'l Enter., Corp.*, 966 F.2d 61 (2d Cir. 1992) (finding laundry truck drivers excluded from FLSA protection although trucks weighed 10,000 pounds and therefore were exempt from Highway Administration's safety regulations).

*2. Judicial Treatment of the MCA Exemption*

In the one MCA exemption case addressed by this court, the operative facts were far afield from those in the case at bar. In *Friedrich v. U.S. Computer Services*, 974 F.2d 409 (3d Cir. 1992), the employees contending that they were entitled to overtime pay were technicians providing installation, maintenance and repair services for cable television firms. In

23

carrying out their responsibilities, the technicians, headquartered in Pennsylvania, drove with their equipment and tools to customers located in Pennsylvania and in all the states bordering on Pennsylvania. Although the technicians generally drove their own vehicles, which weighed less than the "commercial vehicles" of over 10,000 pounds that the DOT had affirmatively undertaken to regulate, we concluded that the DOT's non-exercise of its regulatory power did not undercut that power.

> Because the plaintiffs literally fell within the MCA exemption and neither Congress nor the DOT has taken action to the contrary, we hold that employees operating passenger automobiles in interstate activities which require them to transport property essential to their job duties come within the reach of the Federal Motor Carrier Act as amended and are therefore exempt from the FLSA's overtime compensation requirements.

*Id.* at 419.

Thus, in *Friedrich*, unlike the case at bar, the employees were in fact driving interstate and doing so as a regular and

24

central dimension of their jobs.  Moreover, their duties required them to transport property as well as themselves.

In turning to decisions in other courts, it appears that, as a general matter, cases sustaining claims of MCA exemption from the FLSA overtime requirements involve patterns of distribution markedly unlike the ACCESS pattern.  Typically, the carrier's activity is a clearly identifiable element of an integrated interstate distribution system.  Also, typically, the items the carrier is transporting are not passengers but freight.

Back in 1947, in *Morris v. McComb*, 332 U.S. 422 (1947), a sharply divided Supreme Court held that truck drivers and mechanics employed by a Detroit carrier engaged in the transport of steel came within the MCA exemption.  Four percent of the transport was "directly in interstate commerce", *id*. at 427; the balance was (a) steel transported "largely within steel plants . . . for further processing . . . an unsegregated potion

25

of [which] was shipped ultimately in interstate commerce," and (b) steel transported "between steel mills and industrial establishments . . . [and] used in connection with the manufacture of automobiles, a substantial portion of which entered interstate commerce." *Id.* In referring to the 4% of the carrier's operations which (unlike the operations of ACCESS) were "directly in interstate commerce," the Court noted that the carrier, in order fully to serve its shippers, had "a practical situation such as may confront any common carrier engaged in a general cartage business, and who is prepared and offering to serve the normal transportation demands of the shipping public in an industrial metropolitan center." *Id.* at 434.

More recent instances in which claims of MCA exemption have been sustained are not dissimilar. For example, in *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002), the Second Circuit found no FLSA protection for an

26

intrastate driver who drove empty beer bottles to a facility from which they were later shipped out of state. However, the *Bilyou* driver's activities were part of a clearly integrated commercial cycle: the beer distributor received full bottles from out-of-state suppliers and distributed them to customers, the plaintiff driver picked up the empties and returned them to the distributor (though technically employed by a different company), and the distributor shipped them out of state and received credit for the returns. *Id.* at 220. Other cases like *Bilyou* similarly involve an integrated system of interstate shipments. *See, e.g., Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir. 1997) (involving local delivery driver for linen service that ordered roughly half of the materials it supplied from out-of-state suppliers, based on specific customers' orders); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993) (involving Oklahoma truck driver who regularly delivered dairy products ordered from his

27

employer's Arkansas plant to customers in Oklahoma); *Beggs v. Kroger Co.*, 167 F.2d 700 (8th Cir. 1948) (involving truck drivers who regularly delivered merchandise - 89% of it from outside the state - to their employer's retail groceries from its warehouse, and who returned empty bottles and unsold merchandise to the warehouse for shipment out of state).

There is no general rule that once something (either passenger or freight) embarks on a journey that will eventually carry it between two states, every moment of that journey, through the last conceivable moment of travel, is necessarily interstate transport under the MCA. Although a mere shift from one carrier to another does not disrupt an *otherwise*-integrated interstate trip, *see The Daniel Ball*, 77 U.S. 557 (1871) (considering the limits of the powers of Congress), the Supreme Court has recognized that this does not mean that all portions of a trip including some interstate travel are necessarily integrated.

28

As Justice Brandeis remarked in *Baltimore & Ohio Southwestern Railroad Co. v. Settle*, 260 U.S. 166 (1922), whether a particular portion of travel is interstate or intrastate "depends on the essential character of the movement." *Id.* at 170 (rejecting an interstate shipper's attempt to pay lower total tariffs by shipping its goods first from one state into another, and then, after taking possession of them, re-shipping them to their ultimate destination in the latter state). The Court made clear in that case that the "essential character" of movement that determines incorporation into interstate transport depends on the individual facts of each case, and that mere proximity in time and space will not necessarily make an intrastate trip part of a larger interstate voyage. *Id.* at 173. Rather, the "essential character" of truly interstate transport will show some "essential *continuity* of movement." *Id.* (emphasis added).

29

When we apply the "essential character of the movement" inquiry to the ACCESS drivers, it is clear that other cases applying the MCA exemption do not suggest the proper outcome here. The ACCESS drivers are not integrated into their passengers' interstate travel to the degree in which many intrastate commercial drivers are integrated into the interstate movement of commercial goods. Indeed, the ACCESS service lacks any legal or institutional connection to the interstate movement of passengers or goods. Although the service's pick-up or drop-off point sometimes coincides in time and space with one endpoint of certain passengers' interstate journeys, there is no well established logical or logistical connection between the two.

The distinction between the "essential character" of the ACCESS drivers' work and that of the commercial freight operations considered in other MCA exemption cases also

30

reflects broader differences in the usual commercial treatment of freight and passenger transportation. The Supreme Court has recognized in another context that "what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey," and that the courts "must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations." *United States v. Yellow Cab Co.*, 332 U.S. 218, 231 (1947). In any event, unlike the delivery drivers in the cases canvassed above, the ACCESS drivers are not part of a clearly-defined, routine interstate commercial exchange controlled centrally by their employer.

Because the cases considering the FLSA status of commercial freight drivers are factually unlike that presented here, we will look outside the array of cases applying the MCA

31

exemption to consider past judicial treatment, in other statutory contexts, of passenger transportation more similar to the ACCESS service.

*3. Interstate Transportation in Other Contexts*

In the 1940s the Supreme Court twice addressed the question whether Capital Transit, a company that provided public transit almost entirely within the District of Columbia, was subject to the regulatory authority of the ICC. The Court's approach, in upholding the ICC's authority, focused heavily on the massive interstate movement of Capital Transit's passengers; the facts of the two *Capital Transit* cases offer an instructive counterpoint to the facts of the case at bar. Thousands of Capital Transit's passengers were commuting government employees who rode the company's streetcars or buses within the District to transfer points where they boarded interstate transportation to Virginia. In its first opinion on the matter,

32

*United States v. Capital Transit Co.*, 325 U.S. 357 (1945) ("*Capital Transit I*"), the Court found that Capital Transit was subject to ICC regulation in part because it provided interstate service on one particular route that ran from the District of Columbia into Virginia. However, on a rehearing of the same case after Capital Transit had discontinued its sole interstate route, the Court again found that the ICC had regulatory authority. The Court stood by its earlier holding that Capital Transit's transportation service - now provided exclusively within the District - was "part of a continuous stream of interstate transportation," and "an integral part of an interstate movement." *United States v. Capital Transit Co.*, 338 U.S. 286, 290 (1949) (per curiam) ("*Capital Transit II*").

The Supreme Court's analysis in *United States v. Yellow*

33

*Cab Co.*, 332 U.S. 218 (1947),[9] offers more guidance here than the *Capital Transit* decisions. Although *Yellow Cab* involved the Sherman Act, not the MCA, it followed *Capital Transit I* in looking to the "commonly accepted sense of the transportation concept" to determine what travel was part of an interstate journey.[10] *Yellow Cab*, 332 U.S. at 231. Indeed, *Capital Transit*

---

[9]*Yellow Cab* has been limited, but not overruled, on grounds unrelated to the matters discussed here. Specifically, in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Court repudiated the intra-enterprise conspiracy doctrine that had been derived from *Yellow Cab*.

[10]*Yellow Cab* has guided courts considering the boundaries of interstate movement under statutes other than the Sherman Act. *See, e.g., Airlines Transp. v. Tobin*, 198 F.2d 249, 251 (4th Cir. 1952) (finding limousine service to and from airport, provided under contract with the airlines, was within interstate commerce as defined under the FLSA); *Mateo v. Auto Rental Co.*, 240 F.2d 831 (9th Cir. 1957) (finding, under the FLSA, that airport drivers in Honolulu were not within interstate commerce where they had no valid contractual arrangements with the airlines). Addressing the scope of the ICC's jurisdiction, the D.C. Circuit referred to *Yellow Cab*, and later FLSA case law based on it, as establishing a general "principle . . . that the degree of contact

34

*II* later noted that *Yellow Cab* "does not conflict with our prior holding [in *Capital Transit I*] that [Capital] Transit's transportation was part of a continuous stream of interstate transportation." *Capital Transit II*, 338 U.S. at 290. In applying the *Capital Transit I* standard to the *Yellow Cab* facts, which involved taxi service to railroad stations in Chicago, the Court noted that "interstate commerce is an intensely practical concept drawn from the normal and accepted course of business." *Yellow Cab*, 332 U.S. at 231. Therefore, the Court directed courts to "mark the beginning and end of a particular kind of interstate commerce by its own practical considerations." *Id.*

---

between the interstate carrier and the local transportation is an important factor [in defining the scope of interstate travel]." *Pa. Pub. Util. Comm'n v. United States*, 812 F.2d 8, 11 (D.C. Cir. 1987) (upholding ICC decision that company providing shuttle service from airport to hotel and back for airline crew was engaged in interstate commerce and not subject to regulation by the state of Maryland).

The Court's application of this approach in *Yellow Cab* is instructive. The Court considered two types of taxi service, both involving taxi transportation of passengers immediately before or after an interstate railroad trip. The first type of service, provided under contracts with the railroads, involved carrying passengers between two railroad stations, in order for them immediately to continue their interstate travels. The Court found that taxis providing this service were "clearly a part of the stream of interstate commerce." *Id.* at 228. Viewing the intrastate portion of the journey - the shuttling between railroad stations - "in its relations to the entire journey rather than in isolation," the Court found that it was "an integral step in the interstate movement." *Id.* at 229.

However, the Court found that taxis providing the second type of taxi service, which merely involved carrying passengers between the railroad stations and their homes, offices, or hotels,

36

were not engaged in interstate commerce. *Id.* at 230. "To the taxicab driver, [such a trip to the railroad station was] just another local fare." *Id.* at 232. Those providing the service had "no contractual or other arrangement with the interstate railroads," nor any joint collection or payment of fares. According to the Court, "their relationship to interstate transit [wa]s only casual and incidental." *Id.* at 231. The Court found, and we agree today, that "[t]he common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination." *Id.* at 231. Thus, "[w]hat happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement." *Id.* at 232.

The second type of *Yellow Cab* service seems more

37

closely analogous to the ACCESS service than *Yellow Cab*'s shuttling between stations or the mass commuter service found to be part of interstate travel in *Capital Transit*. ACCESS service to interstate terminals similarly involves no joint fare or ticketing arrangement, and no prior arrangement of any kind, contractual or otherwise, with the railroads, airlines, or other companies that carry a certain few ACCESS passengers across state lines. Also, there is no strong, established cycle of regular passenger movement between the ACCESS service and particular interstate routes. To the ACCESS drivers and their passengers, a trip to an interstate travel hub is "just another local fare."

This lack of coordination with other transportation distinguishes PTC's ACCESS service not only from the *Yellow Cab* taxi shuttles, but also from airport shuttle arrangements that this court found in *Southerland v. St. Croix Taxicab Association*,

315 F.2d 364 (1963), to be part of passengers' interstate travel. In *Southerland*, the local government of the Virgin Islands had made an exclusive arrangement for a local taxi company to provide all transportation from the airport to local hotels. This court found that the preferential arrangement favoring the local taxi company unreasonably burdened interstate commerce because it conflicted with prior arrangements by the plaintiff's tour agency to provide the same service for certain passengers on an interstate package tour. *Id.* The tour agency's transportation services were found to be part of the passengers' interstate travel, although the agency did not itself provide direct interstate transportation, because the services "had been arranged for [the passengers] and paid for in advance as an integral part of their all-expense interstate journey." *Id.* at 369. Therefore, this court ruled that "it cannot, *under these facts*, be said that the service rendered by the plaintiff under his contract

39

was distinct and separate from the interstate journey or that it was just another local fare." *Id.* (emphasis added).

Unlike in *Southerland*, the ACCESS drivers' services are not arranged as part of their passengers' interstate travels through a pre-packaged tour, or linked in any other way. Even where certain of ACCESS passengers' travels will eventually carry them out of the state, the ACCESS service itself is purely intrastate.

Accordingly, we conclude that there is no "practical continuity of movement," in connection with the ACCESS drivers' services. Hence, the MCA exemption does not apply. While "through ticketing" is one example of a common arrangement involving both intra and interstate portions of passenger transport, it is not the only means of establishing that passenger transport operating *intrastate* is in practical continuity with a larger interstate journey. In that sense, the District

40

Court's reasoning missed the mark even though its conclusion was correct. In this case, as we have stated, there is no evidence of *any arrangement* between PTC and the other carriers, thus rendering the MCA exemption inapplicable to the ACCESS drivers.

## IV.

When an employer contends that a sub-set of its employees are excluded from FLSA overtime entitlements by virtue of the MCA exemption, "[i]t is the employer's burden to affirmatively prove that its employees come within the overtime exemption, and any exemption from the Act must be proven plainly and unmistakably." *Friedrich*, 974 F.2d at 412. We conclude that PTC has not made the required showing. Accordingly, the judgment of the District Court will be affirmed.

Although I concur with the judgment reached by the majority, I write separately because I disagree with the majority's analysis in Part III.B. of the Opinion. In that Part, the majority seeks guidance from regulations and case law as to whether Appellees are engaged in "interstate commerce." That inquiry, although scholarly and interesting, is not necessary to resolve this appeal.

Rather than probing the contours of interstate commerce within the meaning of the Motor Carrier Act, I would hold the plain language of the Act's jurisdictional statute to be dispositive. That statute gives the Secretary of Transportation the authority to establish qualifications and maximum hours for employees of a motor carrier—thereby triggering the Motor Carrier Act exemption—only "to the extent that passengers, property, or both, are transported by motor carrier . . . between

a place in . . . a State and a place in another State." 49 U.S.C. §

13501. As PTC ACCESS drivers, Appellees transport

individuals from locations within Pennsylvania to other

locations within Pennsylvania, without crossing state lines.

They do not transport passengers "between a place in . . . a State

and a place in another State." *Id*. Thus, the Secretary of

Transportation has no power to establish Appellees'

qualifications and maximum hours. *Id*. Absent this power, the

Motor Carrier Act exemption does not apply and PTC must

comply with the Fair Labor Standards Act's overtime pay rules.

*See* 29 U.S.C. § 213(b)(1).

Neither the District Court in its order granting

partial summary judgment, nor the parties in their briefs before

us, relied upon the plain language of 49 U.S.C. § 13501. They

assume instead, and the majority follows suit, that it is necessary

to interpret the term "interstate commerce." This assumption is

understandable, as it is derived from language in a Supreme Court opinion. In determining the applicability of the Motor Carrier Act exemption under different circumstances, the Court in *Levinson v. Spector Motor Service* held that the Interstate Commerce Commission (now the Secretary of Transportation) has the power to establish qualifications and maximum hours of service for employees of a motor carrier whose employment "affects the safety of transportation . . . in *interstate commerce*." 330 U.S. 649, 687 (1947) (emphasis added). Relying on this language, the parties focus on the definition of "interstate commerce" and attempt to discern its meaning by referring to case law and regulatory definitions. The majority, in Part III.B. takes a similar approach—one I believe to be unnecessary.[11]

_____

[11] I recognize that I am rather lonesome in this view, in that other Courts of Appeal have also explored the scope of the Motor Carrier Act exemption via inquiry into the presence or absence of interstate commerce. *See Bilyou v. Dutchess Beer Distrib., Inc*., 300 F.3d 217, 223 (2d Cir. 2002); *Klitzke*

44

The plain language of the Motor Carrier Act's jurisdictional statute governs the Secretary of Transportation's authority to establish Appellees' qualifications and maximum hours of service. It is unambiguous and does not contain the term "interstate commerce." To the extent the definition of that term does have any relevance here, its proper understanding is found in a source not previously considered: the United States Code.

---

*v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir. 1997); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993); *Beggs v. Kroger Co.*, 167 F.2d 700, 702–03 (8th Cir. 1948). In so doing, the Courts in each of these cases relied upon *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943). In *Walling*, the Supreme Court held that purely intrastate acts may constitute interstate commerce within the meaning of the Fair Labor Standards Act if the intrastate acts are part of a "practical continuity of movement" between states. *Id.* at 568. As the majority points out, however, the contours of interstate commerce under the Motor Carrier Act and the Fair Labor Standards Act are different. *See* 29 C.F.R. § 782.7(a). Thus, *Walling* has no bearing upon the scope of the Motor Carrier Act exemption. The Courts of Appeal relying upon the case to determine the scope of the exemption have done so in error.

45

In 1947, the year the Supreme Court decided *Levinson*, the Motor Carrier Act contained a statutory definition of interstate commerce. *See* 49 U.S.C. § 303(a)(10) (1940). It would appear that when the Court used the term, it did so pursuant to its understanding of the then-existing statutory definition. At the time the Court decided *Levinson*, the Motor Carrier Act defined "interstate commerce" as "commerce between any place in a State and any place in another State . . . whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water." *Id.* It is worthy of note that this definition is similar, albeit not identical, to the present day Motor Carrier Act jurisdictional statute found at 49 U.S.C. § 13501, which was added to the Act after the Court decided *Levinson*. But whether Appellees' employment would fall within the 1947 statutory definition is irrelevant, as that definition no longer exists in the United States

46

Code.  What *does* exist is the present day jurisdictional statute, the plain language of which resolves this appeal without the need for resort to regulatory definition or case law.

Because I would decide this issue upon the plain language of 49 U.S.C. § 13501, I do not join Part III.B. of the Opinion.  With respect, I concur in the judgment.

47