PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3663
_____

SECRETARY UNITED STATES DEPARTMENT OF
LABOR

v.

BRISTOL EXCAVATING, INC.; CALVIN BRISTOL,
Individually and as owner of Bristol Excavating, Inc.,
                                                    Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-16-cv-01512)
Magistrate Judge:  Hon. Karoline Mehalchick
_____

Argued
September 11, 2018

Before:   SMITH, *Chief Judge*, JORDAN, and RENDELL,[*]
*Circuit Judges*

(Filed: August 20, 2019)
_____

Casandra K. Blaney
Harold G. Caldwell   [ARGUED]
Brann Williams Caldwell & Sheetz
1019 West Main Street
Troy, PA  16947
      *Counsel for Appellants*

Kate S. O'Scannlain
   Solicitor of Labor
Jennifer S. Brand
   Associate Solicitor
Paul L. Frieden
   Counsel for Appellate Litigation
Rachel Gold Berg   [ARGUED]
   Senior Attorney
United States Department of Labor
Division of Fair Labor Standards

---

[*]   This case was argued before the panel of Judges Jordan, Vanaskie, and Rendell.  The Honorable Thomas I. Vanaskie retired from the Court on January 1, 2019.  The panel was reconstituted on March 8, 2019 pursuant to I.O.P. Chapter 12 to its present composition.  Chief Judge Smith had the same briefs and record that were before the original panel and has read the transcript of the argument before the court on appeal.

Room N2716
200 Constitution Avenue, NW
Washington, DC 20210
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case presents a matter of first impression: whether, within the meaning of the Fair Labor Standards Act (the "FLSA" or "Act"), 29 U.S.C. § 203 *et. seq.,* an employer must treat bonuses provided by third parties as "remuneration for employment" when calculating employees' overtime rate of pay.

Under the FLSA's overtime provisions, *id.* § 207, employers must pay employees one-and-a-half times their "regular rate" of pay for all hours worked above a forty-hour work week. 29 U.S.C. § 207(a). "[R]egular rate" is defined as including "all remuneration for employment paid to, or on behalf of, the employee," subject to eight enumerated exemptions. *Id.* § 207(e)(1)-(8). But "remuneration for employment" is not defined in the overtime provisions or elsewhere in the Act.

The Department of Labor, despite decades of enforcing the FLSA, has only recently discovered in that 80-year-old statute a basis for asserting that employers are bound to include bonuses from third parties in the regular rate of pay when calculating overtime pay, regardless of what the

3

employer and employee may have agreed. This case thus asks us whether the expectations of employers and employees are made irrelevant by a novel statutory interpretation and a new enforcement strategy by the Department of Labor.

The District Court, agreeing with the position of the Department of Labor, concluded that the incentive bonuses at issue here must be included in the regular rate of pay because they are remuneration for employment and do not qualify for any of the statutory exemptions. We disagree that all incentive bonuses provided by third parties are necessarily "remuneration for employment" under the Act and therefore properly included in the regular rate of pay when calculating overtime pay. Instead, we hold that incentive bonuses provided by third parties may or may not be remuneration for employment, depending on the understanding of the employer and employee. In this case, the factual record does not support a finding that all of the incentive bonuses were necessarily remuneration for employment. We will therefore affirm in part, vacate in part, and remand in part for further proceedings.

## I.  BACKGROUND

Bristol Excavating Inc. ("Bristol") is a small excavation contractor, owned and operated by Calvin Bristol, the sole proprietor. Talisman Energy Inc. ("Talisman") is a large natural gas production company with active drill pads in Pennsylvania. Bristol entered into a master service agreement with Talisman to provide equipment, labor, and other services at Talisman drilling sites. Due to the nature of the business, Bristol employees at those sites put in extensive overtime

hours, working shifts of twelve-and-one-half-hours daily for two-week periods before having a week off.

At some point, Bristol employees became aware of a bonus program sponsored by Talisman (the "Talisman Bonuses"), which was offered to all workers at its drilling sites, including employees of contractors. The program rewarded employees with distinct bonuses for safety, for efficiency, and for completion of work, the last being called the "Pacesetter" bonus.

Bristol's employees asked Bristol if they, like other workers at the sites, could receive the Talisman Bonuses. Bristol in turn posed the question to Talisman, which said yes. Bristol then agreed to undertake the clerical work necessary for its employees to receive the bonuses. Talisman emailed Bristol when workers at a particular site had earned a bonus, and Bristol identified whether any Bristol employees were working at that site, submitted invoices for the bonuses to Talisman for payment, accepted bonus payments from Talisman, deducted taxes and other costs and fees, and distributed the bonus payments to its employees. Bristol and Talisman, however, never added the bonus arrangement to their master service agreement, and neither Bristol nor Talisman entered into a formal contract with Bristol's employees with respect to the bonuses. Of particular relevance now, Bristol did not include the Talisman Bonuses in the regular rate of pay when calculating overtime compensation for its employees.

An auditor from the Department of Labor visited Bristol's offices as part of a routine inspection to assure Bristol was properly calculating overtime compensation.

5

Following that inspection, the auditor determined that the Talisman-paid bonuses must be added in the calculation of the Bristol employees' regular rate of pay. The Department of Labor endorsed that determination and, as a consequence of Bristol's decision to allow employees to receive the Talisman Bonuses, the Department insisted that Bristol pay for overtime at a higher rate. When Bristol refused, the Department filed this suit, alleging that Bristol violated the FLSA's overtime provisions.

The parties filed cross motions for summary judgment, which the District Court[1] resolved in a single order, granting the Department's motion for summary judgment and denying Bristol's motion for summary judgment.[2] The Court concluded that Bristol violated the FLSA's overtime provisions by failing to include the Talisman Bonuses in the "regular rate" and that the violations are subject to the statute's mandatory liquidated damages provision, but the

---

[1]  The parties consented to the jurisdiction of the magistrate judge. *See* 28 U.S.C. § 636(c)(1) (Upon the consent of the parties, a … United States magistrate judge … may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case[.])

[2]  The District Court's order declared that the Department of Labor's motion for summary judgment was "granted in part" (App. at 21), but the Court resolved all of the Department's claims. Although injunctive relief was denied, there was no further action to be taken, so the order was final. Neither party argues otherwise, and the judgment is now ripe for review.

Court denied the Department's request for injunctive relief. Bristol timely appealed.

## II. DISCUSSION[3]

On appeal, Bristol continues to argue that the District Court erred in concluding that the Talisman Bonuses should be included in the "regular rate." Bristol contends the bonuses were not remuneration for employment or, in the alternative, that they qualified for a statutory exemption. The Department of Labor responds by arguing that "[t]he payments are indisputably remuneration for employment … because they are payments made to Bristol's employees that are directly tied to the hours and quality of work that the employees performed for Bristol." (Answering Br. at 10.) In the Department's view, all "compensation for performing work" qualifies as remuneration for employment (Answering Br. at 15), regardless of whether the payment is provided by a third party, and no statutory exemption applies to the Talisman Bonuses.

We conclude that the District Court erred in determining that all payments relating to employment, regardless of their source, must be included in the regular rate

---

[3] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, as well as 29 U.S.C. § 217. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment, and likewise over a district court's interpretation of the FLSA. *Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 180 (3d Cir. 2000).

of pay, absent a statutory exemption. Instead, whether a payment qualifies as remuneration for employment depends on the employer's and employee's agreement. Under the correct legal standard, and on the record before us, there is a genuine dispute of material fact as to whether the efficiency and Pacesetter bonuses are remuneration for employment, so we will vacate in part the District Court's judgment and remand for further consideration of those bonuses.[4] But, we conclude that the safety bonus is remuneration for employment and is not subject to a statutory exemption, and thus we will affirm the District Court's judgment as to that bonus.

### A. Incentive Bonuses Qualify as Remuneration for Employment Only by Agreement.

When interpreting a statute, we begin, of course, with the text. *Cazun v. Att'y Gen.*, 856 F.3d 249, 255 (3d Cir. 2017). If the statute's text is unambiguous, our inquiry ceases. *Matal v. Tam*, 137 S. Ct. 1744, 1756 (2017). To the extent the text may have multiple meanings, we must endeavor to discern Congress's intent. *Susinno v. Work Out World Inc.*, 862 F.3d 346, 348-49 (3d Cir. 2017).

Here, the pertinent provision of the FLSA says that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to,

---

[4] Because we need to remand, given that the efficiency and Pacesetter bonuses cannot at this stage be called remuneration for employment, we need not determine whether those payments qualify under the statute as exempt from inclusion in the regular rate of pay.

8

or on behalf of, the employee," subject to certain statutory exceptions. 29 U.S.C. § 207(e). But it does not define "remuneration for employment" or address payments from third parties to employees.

The Department of Labor handles that silence by arguing that "there is a presumption that remuneration in any form is included in regular rate calculations." (Answering Br. at 9 (citations omitted).) That argument begs the question. To say that all remuneration for employment is included in the "regular rate" does not answer whether a payment, in the first place, is remuneration for employment.[5]

The Department of Labor also seems to argue that we should treat the Act's silence on the meaning of "remuneration for employment" as proof that all sources of income should be treated the same when analyzing whether a payment qualifies as such remuneration. That argument, though, ignores the understanding of the parties to the actual employment agreement. The silence of the Act is better understood as evidence that Congress took it for granted that it was only regulating the employer–employee relationship, not re-writing that relationship to impose the effects of decisions made by third parties. After all, the FLSA was drafted more than 80 years ago against a long-understood and still true principle: employment contracts *are* contracts and must be interpreted to reflect the agreement reached by the parties. "Remuneration for employment" should therefore be

---

[5] The Department is correct, however, that if a payment qualifies as remuneration for employment there is a presumption that such remuneration will be included in the "regular rate." *See Madison*, 233 F.3d at 187.

9

understood as being what the employer and the employee agreed would be paid for the job.

There is, moreover, strong support in other provisions of the FLSA for the view that third-party payments should be viewed differently from those made by an employer. The FLSA as originally passed contained no reference to any payments from third parties to employees. Fair Labor Standards Act of 1938, ch. 676, § 1, 52 Stat. 1060-69 (1938). In 1966, though, Congress amended the Act to allow tips received by employees to be counted by employers in determining whether they have fulfilled up to 50% of their minimum wage obligation. Pub. L. No. 89-601, § 101(a), 80 Stat. 830 (1966) (adding § 203(m) to 29 U.S.C. § 203). Thus, the first time that Congress spoke about third-party payments, it allowed employers to count such payments – up to a point – for the purpose of the minimum wage requirement. If such payments had already been understood in the law to be included in employees' wages, that amendment would have been superfluous. The 1966 amendment indicates the sensible legislative understanding that money given by a third party to an employee is not automatically remuneration for employment. As the Supreme Court observed, "[t]he Fair Labor Standards Act is not intended to do away with tipping" and "not every gratuity given a worker by his employer's customer is a part of his wages[,]" meaning, of course, the wages used to calculate the regular rate of pay. *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 388, 404 (1942). In 1974, Congress clarified that tips could only be counted towards the minimum wage requirement if the "employee has been informed by the employer." Pub. L. No. 93-259, § 13(e), 88 Stat. 65 (1974). In other words, a third-party payment – tips – would be included in the regular rate of pay

10

if there was an understanding between employer and employee about the treatment of the third-party payment.

At least one of the statutory exemptions to the overtime provisions gives further support to reading the FLSA as treating third-party payments differently. That exemption excludes from the regular rate of pay any discretionary incentive bonuses paid by employers. 29 U.S.C. § 207(e)(3) (exempting "[s]ums paid in recognition of services performed during a given period if … both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly"). It seems unlikely that Congress intended to exempt discretionary payments from employers, but not such payments from customers.

The guidance we have from the case law is also consistent with that view. The Supreme Court has described the regular rate of an employee's pay as a matter of agreement between the employer and the employee, saying, "[t]he regular rate by its very nature must reflect all payments which *the parties have agreed* shall be received regularly during the workweek, exclusive of overtime payments." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) (emphasis added). That common-sense view has never before been challenged.

Therefore, a rule that looks to the contracting parties' understanding to determine whether a third-party payment (even if transferred to an employee by his employer) is remuneration for employment is the correct approach, as

11

opposed to the Department's all-third-party-payments-are-always-remuneration rule.  Both contracting parties are safeguarded by respecting their actual understanding.  Money that employers and employees have agreed – either explicitly or implicitly – is part of regular pay cannot be funneled through third parties to dodge overtime requirements, so employees are protected.  At the same time, employers are protected from being on the hook every time a third party chooses to add to an employee's income.

Two examples illustrate the latter point.  Take the case of a youngster on his first job.  Because his father wants him to excel and cares about the family's reputation, he offers his son an extra five dollars every time the boy can show he successfully completed a certain number of assigned tasks at work.  Such a third-party payment gives an incentive to the youngster to perform well for his employer, but, even if the employer knew the father was providing his son with that bonus, it would simply be wrong to say that the extra pay should be considered remuneration for the boy's work, unless this was part of the employment agreement.  Under the Department's rule, however, the employer would be forced to include the father's payment in the regular rate of pay, meaning that the father could cause the employer's labor costs to increase, without the employer having any say in the matter.  A rule that focuses on what the parties agreed to, on the other hand, would exclude such payments and enable the employer to determine and limit its own labor costs.  And, as described above, nothing in the Act or the history of its enforcement indicates that such a bonus belongs in the regular rate of the son's pay.

Next, consider a car service driver. A regular passenger tells his driver that each time the driver is on time he will give the driver an extra ten dollars. The passenger pays this by credit card, and the driver's employer remits the regularized tip to the employee, as the law requires. That incentive bonus arrangement clearly benefits the employee, and it arguably helps the employer too, as its customer is happier if the driver is on time. But the mutuality of satisfaction with the bonus does not make it part of the employment agreement. Again, the Department's rule would allow the customer to unilaterally alter the employer's labor costs, whereas a rule that focuses on the parties' agreement would prevent the employer's costs from being decided by the whims of an outsider.

In short, in both the case of the youngster and the car service driver, looking to the parties' agreement protects the employer from having to pay for a third party's generous actions. It does damage to the employment relationship to force employers to include promised bonuses from third parties as remuneration in the regular rate of pay, unless and until the evidence demonstrates that those bonuses have become part of the pay calculation agreed to in some fashion by the employer and employee.

In like manner, respecting the contracting parties' actual agreement protects the employee. One can imagine a circumstance in which an employer tries to pressure an employee to accept remuneration from a third party so as to artificially suppress on paper what the employer and employee both regard as the regular rate of pay. Such a manipulation would also occur if an employer tried to categorize a portion of what was base pay as instead being a

13

bonus. The parties' true agreement is what should matter, not labels. *See Youngerman–Reynolds Hardwood*, 325 U.S. at 424 ("[The regular rate] is not an arbitrary label chosen by the parties; it is an actual fact.").

This is not only a matter of common law, but also of common sense.[6] It is axiomatic that a mutual assent is

---

[6] As for common sense, we cite no less an authority than Clark W. Griswold. In the classic movie *National Lampoon's Christmas Vacation*, the plot revolves around Clark's anxious anticipation of his Christmas bonus. *See* National Lampoon's Christmas Vacation (Warner Bros. 1989) (Really, you should see it.). When the regular bonus does not arrive and instead Clark receives a jelly-of-the-month club membership, he berates his boss, saying, "Seventeen years with the company, I've gotten a Christmas bonus every year but this one. You don't want to give bonuses, fine. But when people count on them as part of their salary, well[.]" *Id.* Unlike the Christmas lights on his house, Clark doesn't seem to be overly bright, but he at least understands how a course of dealing can lead to an expectation that could be viewed as a meeting of the minds about remuneration for employment. In other words, it is common sense that labels alone do not control. And, of course, the required agreement between employer and employee need not be explicit. It may be implied through an employer's significantly facilitating regular compensation that reaches the employee. *Walling v. Richmond Screw Anchor Co.*, 154 F.2d 780, 784-85 (2d Cir. 1946). Whether an agreement is fairly implied is discussed further herein. *See infra* at II.B.

14

necessary to form a contract. *See* 1 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 4:1 (4th ed. 1993 & Supp. 2019) (recognizing that long-standing principle and noting that "the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract"). The FLSA naturally takes account of that.

The Department of Labor views the situation differently. It relies on three Wage and Hour Division Opinion Letters, a district court opinion, and the purpose of the FLSA to contend that "compensation for performing work" qualifies as remuneration for employment, regardless of whether the payment is provided by a third party and no agreement exists. (Answering Br. at 15.) But none of those authorities will bear the weight of the conclusion pressed by the Department.

The three Wage and Hour Division Opinion Letters the Department of Labor relies on do not actually undercut the necessity of an agreement at all. Two of the letters – one from 2005, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (July 5, 2005), and one from 1966, U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 16, 1966) (Answering Br. Add. B) – address programs in which retail employees could earn a bonus by selling a vendor's products. In the scenarios those letters describe, a third party sponsored the bonuses in concert with the employer. The sponsorship was effectively joint.[7] Thus, the bonus payments could, given

---

[7] Those programs addressed a vendor compensating retail employees under circumstances where the only

15

the specific facts of those cases, rightly be seen as part of the relevant employment agreements. The third letter, another from the mid-60's, covers a third-party payment from a taxi cab company to hotel doormen. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (May 25, 1967) (Answering Br. Add. A). In that scenario, the hotel employees received regular monthly payments from the cab company and the employer actively advocated treating those payments as remuneration for employment. *See Walling v. Richmond Screw Anchor Co.*, 154 F.2d 780, 784 (2d Cir. 1946) (concluding that payments that were regularly and actually made and facilitated by the employer could qualify as remuneration for employment). Significantly, the employer was seeking a determination from the Department of Labor that the third-party payments could be credited towards the employer's minimum wage obligations. In other words, the hotel embraced, rather than disputed, that the payments to the doormen were compensation for employment. Facts like that matter.

The district court case the Department of Labor relies on, *Romano v. Site Acquisitions, LLC*, is also unpersuasive for the position the Department has taken here. No. 15-cv-384, 2017 WL 2634643 (D.N.H. June 19, 2017). First of all, the Department has enforced the FLSA for a very long time, yet it can only point to a single unreported district court opinion

conclusion that can be drawn is that the programs were jointly sponsored. Because in each instance the retailer controlled both the store and its employees, it had to have approved and actively participated in the program from the outset for the sponsorship program to function.

indicating that an incentive bonus from a third party could be included in employees' remuneration for employment. *Id.*, at *8-9. The near total absence of other authority is alone telling. If, in eight decades, no court has said what the Department of Labor now asserts is the meaning of the statute, that interpretation is probably unsupported because it is unsupportable.

Moreover, a careful reading of *Romano* lends little aid to the Department's position. *Romano* did not reach the conclusion that incentive bonuses are always remuneration for employment. The court in that case held that an incentive bonus that AT&T gave a contractor's employees, paid through the contractor, could be included when calculating the regular rate. 2017 WL 2634643, at *1-2, 4, 8-9. But the court's analysis focused on the statutory exemptions to overtime calculations and not on whether the payments were "remuneration for employment" in the first place. *Id.* at *8-9. As the Department acknowledges, in *Romano* the employer did not argue that the payments were not remuneration for employment, only that they fit under an exemption. *Id.* In addition, the procedural posture of the case was a motion by *the employer* for summary judgment. *Id.* at *8. The court therefore only determined that the employer's exemption-based arguments in favor of summary judgment were insufficient. The opinion went no further.[8]

---

[8] The Department also cites to *Mata v. Caring For You Home Health, Inc.*, 94 F. Supp. 3d 867 (S.D. Tex. 2015), but that case is plainly inapposite. In *Mata*, money from a state health program was used to pay employees' bonuses, but the employer retained discretion to decide if the money would be given as a bonus or used for health insurance. *Id.* at 876. The

17

The Department of Labor also argues that its preferred definition of remuneration for employment "is reasonable in light of the purpose of the FLSA" and is supported by our Court's long recognition of "the FLSA's broad remedial purpose." (Answering Br. at 29 (citations omitted).) The statutory purpose that the Department focuses on is the protection of the "general well-being of workers." 29 U.S.C. § 202(a). But the FLSA also recognizes that protecting the "general well-being of workers" is to be done "without substantially curtailing employment or earning power." 29 U.S.C. § 202. The Department completely ignores that statutory purpose, reflecting a very short-sighted understanding of worker well-being.

Imposing unexpected costs on employers does not work to the long-term benefit of employees. On the contrary, an employer's costs can certainly have negative consequences for employees. The Department's preferred rule would encourage employers to stop allowing their employees to accept bonuses from third parties, lest the employer's own labor costs increase. If that predictable consequence ensues, employees will be denied extra income. And, if some companies decide to swallow the risk and allow such bonuses, they will nevertheless have to deal with the

court's analysis only addressed whether the payments qualified under an exemption to § 207(e), since employees had been told "that they would receive the bonus as part of their wages" and there was little doubt the bonuses were agreed to serve as compensation for employment. *Id*. at 875-76.

18

increased labor costs in some way. They will either increase their prices as they bid on jobs, or, to remain competitive, they will cut costs somewhere, perhaps by hiring fewer workers. The challenge will be particularly felt by small businesses that can ill-afford to deal with the added expense and complexity imposed by the Department's rule. In the end, allowing third parties to unilaterally increase a company's labor costs is likely to be bad for employees as well as employers. For instance, here, had Bristol known that permitting the employees to qualify for the bonuses would increase its labor costs, perhaps it would have said no when the employees asked if they could accept them. The Department thus is arguably not following the FLSA's instruction to protect the "general well-being of workers[.]" *Id.*

But even if the pain of the Department's interpretation were only visited on employers, it is a "flawed premise" to think "that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citations omitted). Indeed, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam). "[A] fair reading" of the FLSA, neither narrow nor broad, is what is called for. *Encino Motorcars*, 138 S. Ct. at 1142. And that is as should be expected, because employees' rights are not the only ones at issue and, in fact, are not always separate from and at odds with their employers' interests.

In short, we reject the Department's proposition that all third-party payments are to be considered remuneration for employment. Instead, we conclude that a third-party payment

qualifies as remuneration for employment only when the employer and employee have effectively agreed it will.

> **B.      The Record Does Not Show That an Implicit Agreement Existed That  All of the Talisman Bonuses Were Remuneration for Employment.**

Here, there was no explicit agreement between Bristol and its employees that the Talisman Bonuses would serve as remuneration for employment.  That, however, does not end our inquiry.  We must determine whether the record shows that there was an implicit agreement that those bonuses would be such remuneration.  *See Richmond Screw Anchor Co.*, 154 F.2d at 784-85 (explaining that the required agreement can be implied through facilitation of compensation regularly and actually reaching the employee); *see also Jacksonville Terminal Co.*, 315 U.S. at 404 (noting that a conclusion that all tips are not included in the regular rate "does not foreclose a decision that in certain specific situations the so-called tips may be in reality the employee's compensation for his services").

Whether an implicit agreement has developed between an employer and its employees that third-party bonuses are rightly regarded as "remuneration for employment" is a question that does not lend itself to an easy, bright-line test.  It presents complexities best resolved by a holistic consideration of the particular facts of each case.  Before one tries to answer the ultimate legal question of how, from a regulatory standpoint, to treat a third-party bonus, there are some signs to look for in the factual record.

As a threshold matter, for a payment to become part of the employment agreement, it must be regularly and actually received by the employee. *Richmond Screw Anchor Co.*, 154 F.2d at 784. That is a necessary but not sufficient condition. That kind of course of dealing can give rise to a mutually understood level of compensation for specific work. Because an employee cannot expect a bonus he does not know he is entitled to, the payment by a third party of an unannounced or truly discretionary bonus should not be classified as remuneration for employment.[9] If, however, an employer

---

[9] Our opinion should not be misunderstood as conflating "remuneration for employment" with a payment's inclusion in the "regular rate." By statute, certain discretionary payments may be renumeration for employment yet not part of the regular rate. *See* 29 U.S.C. § 207(e)(3) (exempting incentive bonus payments where the employer retains discretion over the amount and fact of payment until close to the time payment is made). We are not, however, wrestling with whether one of the statutory exemptions applies to keep remuneration for employment out of the regular rate of pay. We are considering here a related but different question: whether an implicit agreement has been reached between the employer and its employees about the treatment of third-party bonuses. And we are suggesting at this point only that, if a third-party bonus is discretionary, that bonus cannot be legitimately expected by the employee and, therefore, cannot give rise to an implicit agreement between the employer and the employee that it constitutes remuneration for employment. *Cf. Balt. & O.R. Co. v. United States*, 261 U.S. 592, 598 (1923) ("And so an agreement to pay for services rendered by the plaintiff will not be implied … when the plaintiff did not expect payment, or

regularly and predictably relies on a bonus to induce certain behavior, that would certainly be a significant factor in determining whether that regular bonus was remuneration for employment, even though the bonuses originated from a third party.[10] And the more direct the employer's involvement is in initiating a program or setting and insisting upon a specific payment from a third party, the clearer it becomes that the employer is invested in the arrangement in a way that could be called an implicit agreement with the employees that the

under the circumstances did not have reason to entertain such expectation; [or] when the defendant understood that the plaintiff would neither expect nor demand remuneration[.]" (citations omitted)).

[10] Thus, if employees do not have a legitimate expectation that they will receive a particular bonus for achieving a particular result, such compensation would not be included in the regular rate. (*Cf.* Oral Argument https://www2.ca3.uscourts.gov/oralargument/audio/17-3663SecretaryUSv.Bristol.%20.mp3 ("Oral Arg.") at 24:38-24:59 (argued Sept. 11, 2018) ([Counsel for Department of Labor]: "[I]f they have announced it in advance … such that the employees have an expectation that they are going to receive it and … it's tied to a metric that's … measurable and inducing the employees to work in a certain way, then, if it is in fact paid, then it is included in the regular rate."); Oral Arg. at 25:57-26:10 ([Counsel for Department of Labor]: "[I]f they have left it completely subjective as to the amount and the fact of payment, then it is more discretionary, but that is not the same as a production bonus in the sense that employees … don't know how much more do I have to work.").)

22

third-party incentive bonuses are remuneration for employment.[11]  *Cf.* 1 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 4:1 (4th ed. 1993 & Supp. 2019) (in asking whether parties have an agreement, the focus is on "their outward expression of assent").

Contrary to the Department's argument, though, an implicit agreement does not arise between an employer and its employees simply because the employer permits its employees to participate in a third-party bonus program and does something to facilitate their receipt of the bonuses.

---

[11] Considering the level of an employer's involvement in the payment is consistent with the line the Department of Labor itself has drawn by directing employers to include service charges, even those paid by third parties, in overtime calculations.  *See* 29 C.F.R. § 531.55(a) ("A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip[.]").  Thus, tips are the property of the employee, while money received from mandatory service charges is always wages when given to the employee.  *Id.*  In contrast to a compulsory charge, a suggested gratuity might need to be included in remuneration for employment, but that decision is best left to the trier of fact.  *See Bradescu v. Hillstone Rest. Grp.*, No. SACV 13-1289, 2014 WL 5312546, at *3-4 (C.D. Cal. Sept. 18, 2014) (concluding that whether customers paying employer-suggested but not employer-compelled gratuities for large parties qualified as "remuneration for employment" was a triable issue of fact).

Many employers permit their employees to receive payments from third parties and take minor steps to facilitate their employees' receipt of those payments, without those payments qualifying as remuneration for employment, tips being the most obvious example. Employers often act as a conduit, processing credit card receipts or otherwise passing through to their employees money coming from third parties. In establishments that allow tipping, that basic facilitation does not transform a tip into remuneration. An employer has no choice but to promptly pass on such payments, or it risks committing tip theft. 29 U.S.C. § 203(m)(2)(B). So an employer's merely acting as an intermediary is not, without more, enough to make such payments remuneration for employment.[12]

That does not mean that facilitation is irrelevant. Far from it. The deeper an employer gets into the creation, management, and payment of an incentive bonus program, the more those bonus payments begin to look like part of the

---

[12] Despite the Department's assertion, withholding of taxes on payments likewise does not transform an employer from an intermediary into something more. An employer is legally required to collect taxes on tips, file tax forms relating to tips, and remit those taxes to the IRS. 26 C.F.R. § 31.3402(k)-1. Courts have similarly concluded, that even when public safety employers, such as police departments, remit payments through their payroll system and deduct taxes for "special detail work" performed by their employees for third parties, those payments should not be used to adjust the regular rate. *See, e.g.*, *Lemieux v. City of Holyoke*, 740 F. Supp. 2d 246, 256 (D. Mass. 2010); *Nolan v. City of Chi.*, 125 F. Supp. 2d 324, 336 (N.D. Ill. 2000).

regular pay structure to which the employer has agreed, and that is the ultimate question: has there been an assent by both the employer and the employees that the third-party bonuses are part of their employment agreement.

To sum up, in order for a course of dealing to result in an implied agreement to treat third-party incentive bonuses as remuneration for employment, a fact finder should consider whether the specific requirements for receiving the payment are known by the employees in advance of their performing the relevant work; whether the payment itself is for a reasonably specific amount; and whether the employer's facilitation of the payment is significantly more than serving as a pass through vehicle. If the answer to all of those questions is yes, there should then be a holistic assessment of the level of the employer's involvement in the third-party bonus program, to determine if it can fairly be said that the employer and employees have adopted the third-party incentive bonuses as part of their employment agreement. There may be other relevant considerations that arise from case to case, but an employer's role in initiating, designing, and managing the incentive bonus program will likely be of high importance.

In short, the question is whether there has been a course of dealing sufficient to characterize the payment as one that is legitimately expected by the employees and legitimately understood as being sponsored in a meaningful way by the employer.[13] *Cf., e.g.*, *McLaughlin v. McGee Bros.*

---

[13] Without a legitimate expectation based on advanced notice, there is no basis for considering whether the bonus is an incentive. Otherwise, the matter is simply too vague and

25

*Co.*, 681 F. Supp. 1117, 1133 (W.D.N.C. 1988), *aff'd sub nom. Brock v. Wendell's Woodwork, Inc.*, 867 F.2d 196 (4th Cir. 1989) (noting that employer-given "incentive-type bonuses … given pursuant to an agreement or understanding as a reward for *specific* employee behavior … must be included in the regular rate" (emphasis added)).

1. *The Record Does Not Support Summary Judgment that the Efficiency and Pacesetter Bonuses Are Remuneration for Employment.*

Here, at least as to the efficiency and Pacesetter bonuses, the record shows there is reason to question whether employees knew the specific requirements to earn a set bonus in advance of performing the relevant tasks, so as to give rise to the requisite expectation. This forecloses for now, at the summary judgment stage, a decision that those incentive bonuses are remuneration for employment. It is possible that they were understood and expected by the employees as part of their job with Bristol, but it is also possible that the bonuses were not understood by the employees as

---

generalized, and, as the Department acknowledges, "[e]very employee knows, 'well if I work hard my employer is going to be happy.'" (Oral Arg. at 26:12-26:15.) The Department also acknowledges the importance of possessing that knowledge in advance in its brief, arguing that "the work requirements for receiving the bonuses … [were explained] before the employees performed the work for which they could earn the bonuses." (Answering Br. at 5.)

26

remuneration from Bristol at all but rather as a discretionary gratuity from Bristol's customer.[14]

The Department of Labor alleges that "Bristol … explained the program to its employees, including the requirements for receiving the bonuses" (Answering Br. at 18 n.9), in advance of the employees' performing the work. And the Department offered some evidence regarding the Talisman Bonus program to support that allegation. But the evidence is either disputed or not sufficient to show that Bristol's employees were aware of the specific requirements to qualify for the bonuses, in advance of performing the work.[15] For instance, while Bristol admitted that it explained

---

[14] The District Court found that it was not disputed that "[the employees] knew the terms for earning each bonus." (App. at 3.) But whether the employees knew the terms of the bonus is a distinct question from whether the employees knew those terms in advance of performing work. Moreover, knowing the general terms is different than knowing the specific terms, and the District Court itself said that "Talisman retained sole discretion" while "Bristol did not have discretion" over the bonuses. (App. at 3, 9.) Bristol's lack of control and knowledge is not dispositive of whether an agreement was in place, but it is enough to raise a genuine issue of material fact as to whether it could have even communicated the specific terms of the bonus to its employees.

[15] The Department states that "bonuses were promised to be paid upon the occurrence of certain events[,]" (Answering Br. at 11,) but the Department points to nothing in the record to support that contention, and we could find no

27

the process for claiming the bonuses to its employees, it did not admit to explaining the process for earning them.[16] Specificity matters. While employees may have been aware, prior to performing their daily duties, that job performance could lead to a bonus, the record suggests that Bristol's employees may not have been aware of the specific requirements to earn a bonus.[17] And some evidence indicates

---

evidence supporting it. The Department asserted that, "[d]uring the [Talisman] meetings, the … operators would also be shown charts explaining why a hole was or was not eligible for a bonus." (Pl.'s Facts D.I. 19-1 at 5-6 ¶ 21.) And, Bristol generally agreed that "[i]nformation pertaining to the bonuses and whether [the employees] had qualified for a bonus for a particular hole was made available to [employees] at the safety meetings." (Def. Res. to Pl.'s Facts D.I. 21 at 18.) But informing employees that they are "eligible" or "qualified" for a bonus after the fact is not the same as informing an employee in advance about the conduct needed to earn those bonuses. Employees knowing that certain behavior could lead to a bonus is not the same as employees knowing it would lead to a bonus.

[16] The Department asserts that "Bristol explained to the … operators the requirements for receiving the bonuses before they performed the work and started receiving the bonuses." (Pl.'s Facts D.I. 19-1 at 4 ¶ 15.) But Bristol denied that allegation. Bristol admitted that it explained the process to claim bonuses but not how to earn them.

[17] For example, one Bristol employee spoke about "know[ing] that it's a *possibility* that we can achieve it," and

28

that Talisman, not Bristol, communicated the terms of the bonus program to Bristol's employees – and may have done so after those employees performed their work, as opposed to before.[18]

Moreover, since Talisman had complete discretion to change the amount of the bonuses it offered or the specific

spoke about the criteria being based on "perform[ing] very well" – a very subjective, not objective, criteria. (App. at 190 (emphasis added).) Another employee indicated a general awareness of the bonuses before performing work, but he did not have any knowledge about the specific requirements to earn any bonus except the safety bonus. While one employee did state that the bonuses were common knowledge known before performing work, he also stated that the charts were "just handed around to see if you got it and if you got it, fine, if you didn't, it would show a chart on why you didn't[,]" indicating the charts were not telling employees what they needed to do but, instead, what they had done. (App. at 168.) Statements like those are enough to create a genuine dispute about whether the Pacesetter and efficiency bonuses were incentive bonuses.

[18]  (*See* App. at 187 ("Talisman … issued out a paper in all of our safety meetings … and it would tell us everything that we achieved and the amount of money that we would be getting[.]); App. at 184 ("Like, they would give us a paper *after* every well and let us know what we got." (emphasis added)); Def. Facts D.I. 23-2 at 8 ¶ 28 (noting Bristol was "not [even] sure what Talisman's criteria were when deciding to pay an [efficiency] bonus or a pace setter bonus.").)

requirements to earn them, and could decide at any time to cancel the bonus program, it is unclear as a matter of fact that Bristol employees could have a legitimate expectation of receiving a given amount for completing a task. One employee even described the Talisman Bonuses being given out of "appreciation[,]" not to induce striving for known benchmarks. (App. at 190.) On the record as it now stands, we cannot definitively say there was a course of dealing sufficient to give rise to an implicit agreement.

The Department of Labor argued in the District Court that "[i]t would, of course, make little sense to institute performance bonuses without telling employees about them in advance." (D.I. 21 at 18 (citation omitted).) That assertion may or may not be accurate, but this much is certainly true: a moving party cannot prevail on summary judgment by arguing an inference in its own favor. Every reasonable inference is to be drawn in the non-moving party's favor, *Tolan v. Cotton*, 572 U.S. 650, 660 (2014), and the record here contains enough evidence to permit the reasonable conclusion that Bristol employees did not have the kind of information that would give them a legitimate expectation of a specific payout for specific performance.

Looking more particularly at evidence pertaining to the efficiency and Pacesetter bonuses, Bristol acknowledged that "the [efficiency] bonus was paid for getting the hole drilled faster than the days Talisman had anticipated for drilling the hole, and the pace setter bonus was paid for drilling deeper on any given day than Talisman had anticipated[,]" (D.I. 23-2 at 8 ¶ 29), but that is not sufficiently specific. "Faster" and "deeper" are subjective criteria unless a benchmark is given. There is no evidence showing employees knew in advance

what drilling faster or deeper meant.[19]  And nowhere in the record is there even an allegation of how much compensation the efficiency bonus would yield.[20]  While one employee testified that the bonuses were "guaranteed every time [and were for] the same amount of money" (App. at 190), the same employee also indicated the amount of compensation employees earned was not shared with employees until after the fact.  Regardless of the degree of Bristol's involvement in the bonus program, then, there remains the question of whether the course of dealing was long enough and consistent enough to amount to an implicit agreement that the bonuses would serve as remuneration for employment.

Therefore, summary judgment was not warranted for the efficiency and Pacesetter bonuses, and we will vacate the District Court's order with respect to those payments.

> 2.  *The Safety Bonus Qualifies as Remuneration for Employment.*

---

[19]  In fact, at oral argument the Department of Labor could not point to a single place in the record that indicated either the Pacesetter or efficiency bonuses were based on objective metrics.  (Oral Arg. at 21:50-22:00.)

[20]  There is a reference in the record to a Pacesetter bonus being $500, but it is not clear that it was always $500.  As noted by the District Court, "[o]ver the course of this working relationship, Talisman changed the amount of the bonus at its leisure."  (App. at 3.)

31

In contrast, the record does adequately establish that the safety bonus was remuneration for employment.[21] The parties do not dispute that Bristol employees knew the specific conduct necessary to earn it – the safety bonus was attained if there were no accidents or injuries during the job. Employees did not have to be briefed daily in order to clearly know the specific conduct required to earn the bonus and have an expectation of receiving it. Employees also knew the specific compensation they would receive. The amount of the safety bonus was always the "daily bonus rate of $20 or $25." (D.I. 19-1 at 5 ¶ 19.) Thus, regardless of whether employees were told daily that they would receive the safety bonus if they met its requirements, there is little doubt they knew the specific conduct required to earn a specific sum and had an expectation of receiving it for doing what was required. It is also undisputed that Bristol's facilitation of the program went significantly beyond merely acting as a pass-through.

Bristol reached out to Talisman to ask if its employees could participate in the bonus program. Bristol tracked which of its employees earned a bonus and reported that information to Talisman. Bristol regularly invoiced Talisman for payment on behalf of its employees. And finally, Bristol concedes that it was responsible for getting those invoices approved by lower level Talisman employees and "sending the information to Talisman's contracted invoice processor." (Opening Br. at 3.) Bristol also collected a "a reasonable processing fee" for its efforts. That level of involvement is enough to support the conclusion that Bristol effectively adopted Talisman's bonus

---

[21] We can affirm the District Court on any grounds. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

32

program and implicitly agreed to make it part of the employment agreement with its employees.[22]

On this record, therefore, the safety bonus is remuneration for employment. And, because the safety bonus does not qualify under any of the statutory exemptions,[23] it

[22] The same may be true as to the efficiency and Pacesetter bonuses, but we leave consideration of a more developed factual record to the District Court in the first instance.

[23] Recall that the FLSA provides eight enumerated exemptions to the requirement that all remuneration for employment be included in the "regular rate" for overtime purposes. 29 U.S.C. § 207(e). The employer bears the burden of establishing the applicability of an exemption. *Madison*, 233 F.3d at 183.

Before the District Court, Bristol argued that the bonuses should qualify under three possible exemptions: "bonus payments as gifts; payments made for occasional periods when no work is performed; and payments paid for services, without prior agreement, where discretionary payment in fact and amount is retained by the employer." (App. at 5-6 (citing U.S.C. § 207(e)(1)-(3)).)

Bristol did not raise in its opening brief the arguments that the bonuses should qualify for the exemption for gifts or occasional periods when no work is performed. As a result, we need not consider those arguments now. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 204-05 n.29 (3d Cir.1990). Even if we did, however, it would be a painful stretch to say that the safety bonus qualifies under those exemptions. Gifts are defined to include "payments in the nature of gifts made at Christmas time or on other special

should be included in the "regular rate" of pay for those Bristol employees who have been earning that bonus.

## III.  CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in part, vacate it in part, and remand for further proceedings consistent with this opinion.

---

occasions," 29 U.S.C. § 207(e)(1), and the safety bonus was not reserved for special occasions.  The exemption for "payments made for occasional periods when no work is performed" requires that work is not performed, but here bonuses were achieved by working at the Talisman sites.  *Id.* § 207(e)(2).

The only exemption Bristol alludes to in its opening brief is the exemption for bonuses where the employer retains discretion.  *Id.* § 207(e)(3).  But here, the safety bonus was regularly paid, and to qualify as a discretionary bonus such a bonus must be paid without "any prior contract, agreement, or promise causing the employee to expect such payments regularly[.]"  *Id.*  The record shows there was a legitimate expectation with respect to the safety bonus.

34